DOE ON THE DEMISE OF MARIA DAGGETT, APPELLANT, VS. CHAS. WILLEY, APPELLEE.

1, In a case of contested boundary, course and distance yield to natural objects, and distance is to be extended or shortened to conform to them.

2. Where parties having an interest in a common boundary, as owners of grants adjoining, agree to a dividing line, and especially where a town is laid out by Commissioners predicated on such agreement, and the property is held thereunder for a great number of years, this is conclusive as against them and those holding under them, and parol testimony is good and admissible to prove such agreement.

3. It is not proper for the Court to charge the jury that circumstantial evidence tending to show a probability that a survey covered the land in dispute, is sufficient to found their verdict.

4. Reputation and hearsay, of themselves, are not evidence ; yet, in connection with other evidence, they may be entitled to respect in cases of boundary after great length of time, and when it may be impossible to prove the existence of the primitive land marks,

5. The Court cannot assume the conclusiveness of the testimony of any witness, and it is error so to charge.

6. The Court will not regard an assignment of error not connected with or necessary to the merits of the case,

7. Whilst the ruling of the Court may be erroneous in some respects, the Court will not reverse the judgment if the verdict is sustained by the evidence.

Appeal from the Circuit Court for Duval county.

This is an action of ejectment for the recovery of a lot of ground in the city of Jacksonville, known on the map of said city as lot No. 5.

The plaintiff offered in evidence to sustain the issue on her part, a deed executed by I. D. Hart, in December, 1836, to William J. Mills, in trust for Maria Doggett, the lessor of the plaintiff, who was then a *feme covert,* but now a widow and *feme sole,* conveying a " certain tract of land situated in Jacksonville, Duval county, Florida, and bounded as follows : on the south by St. Johns river, on,

the north and east by Hogan's Creek, and on the west by lands granted to the heirs of Purnal Taylor, and now owned by I. D. Hart, which described as above, was formally granted by the Spanish Government to Juan Maestre, and by Hart purchased from John Bellamy, &c, incluing fifty acres," &c.

The plaintiff also offered in evidence the petition of John Masters to the Governor of Florida, dated 18th November, 1816, representing the straightened circumstances of the petitioner, and praying for a "grant of one hundred acres of vacant hammock land on the north side of the St. Johns River, opposite the battery of St. Nicholas, and bounded by Mr. Daniel Hogan's plantation in the neighborhood of a creek." Attached to which petition is a decree of the Governor dated 2d December, 1816, directing that there be "granted to the petitioner the one hundred acres of land at the place mentioned, without injury to any third party, and a certified copy thereof as evidence be issued to him from the Secretary's office." To which is also appended a note, as follows: "By a decree rendered at the instance of the petitioner of the 2d of last month, there were granted to him fifty acres of land at the south point of St. Johns Bar, distant about one mile from Quesadas Battery, which grant has been made to him in consequence of his having proved that up to the present time he had located but fifty acres out of the one hundred granted him."

The plaintiff also offered the survey and plat made in obedience to the decree aforesaid, which survey is as follows:

"I, Don George Clark, Lieut. of the militia of St. Augus-

tine of Florida and Surveyor General appointed by the Government of the said place and province, do certify that I have measured and bounded for Don Juan Maesters fifty acres of land on the north side of St. Johns River, at a place called Cowford, or ferry of the King's road, being a part of one hundred acres granted to him by the Government on the 13th of December, one thousand eight hundred and sixteen, which survey agrees with the following plan and its original which is recorded in the book of surveys of land under my charge. Fernandina, 21st of February, 1817."

On the plat of this grant, outside of the west boundary, are the words "Maria Taylor's lands;" on the north is Hogan's creek, and on the south the St. Johns River. The first line runs from the confluence of Hogan's Creek and St. Johns River, west, thirty chains, to the second line, which begins on the St. Johns River and runs north thirty-three and a half chains to a pine.

Plaintiff also read in evidence the grant and survey of a tract of two hundred acres of land granted by the Spanish Government, on the 13th day of September, 1816, to Maria Taylor, commencing on the north side of St. Johns River, at the mouth of M'Coy's Creek, running thence north 40 chains to a pine, thence east fifty chains to a pine, thence south 40 chains to an oak on the St. Johns river. On the plat of the survey of the Maria Taylor grant, outside of the east boundary, are the words " Juan Maesters' Land."

Plaintiff then offered Thomas Suarez as a witness, who testified that he is acquainted with the Maria Taylor and John Masters' grants. Hogan's Creek adjoins the town to.

the east and M'Coy's Creek is the first Creek above and to the west. Was one of the chain carriers when the surveys were made. The surveys were made by a Mr. Miller —not farther back than 1817—who it was said acted as deputy under George I. F. Clark. We started on the Taylor grant, commencing at the mouth of M'Coy's Creek at a "gum tree;" has seen the tree since, but it is not now standing. There is an old Spanish line there now, but when we run it there was none. We run a line from the Creek out; thinks the first line was north. The next line went down towards Hogan's Creek, and the third line ran back to the river. We marked a corner, thinks it was an oak in the hammock—there were no pines there. The tree stood as close to the river in the hammock as we could get—has seen the oak since, but it has been a great many years ago. Can't state now where the south-east corner of the Taylor grant was, as the town now covers it, but it was above where the Masters' line came. These two lines did not come together. The corner of the Taylor tract was some distance above Market-street. The Taylor grant was run out first. On the same day we commenced at the mouth of Hogan's Creek and ran the Masters grant. We chained along the bluff up the river, can't say how many chains we run, but when he got his complement he made a corner. It was not up to the Maria Taylor grant. There was no other line marked on the ground. In running the west line of the Taylor grant we made surveyors marks on the trees—a blaze and two chops. Has traced this line lately and found Spanish marks. There is another line, one made by the United States, *a little this side;* thinks this is the line on which there are some old marks. They

are not far apart, about fifty yards. Witness has seen trees blazed on the first line going out. Knows the premises, on the corner of Market and Bay-streets, in dispute— does not think they are within the lines of the Taylor grant as surveyed by us—thinks they lie east of the Taylor grant. Witness does not know of his own knowledge that Miller had any authority from Clark, the Spanish Surveyor-General, nor was he present when Clark surveyed these grants. There are now three or four gum stumps at the mouth of M'Coy's Creek.

John M. Irwin, another witness for plaintiff, testifies that he is a surveyor, that he has recently run the Taylor grant. That he commenced at a gum stump, and run according to the first line of the plat, north forty chains on an old line, and made a corner, thence east fifty chains and made a corner in a marsh, thence south to the river and found *plain marks on the west line—an old well marked line*—found none on the north line. He commenced at a stump—no one pointed it out—he found it. They commenced at a stump north-east of the well defined line, two chains twenty-three links, pointed out to them. After running with the compass and searching for an old line they abandoned that. There were some indications of a new line, but no old one. In running the well defined line they crossed two cypress ponds. The last pond very close to the termination of the forty chains. From a corner at the end of the forty chains they ran fifty chains to the east, thence south to the river, and came out on the river at the east boundary of Ocean-street. Witness was on the ground at the starting point with Mr. Suarez, and while he was taking observations, Suarez said "that must be the stump." There was no

other old Spanish line in that vicinity, that witness could find. There were no marks on the north line.

The mouth of M'Coy's Creek is east of the stump, from which he started to run these lines. He did not measure the distance, but supposes it to be two hundred feet or a little better. The first stump from which he started is nearer the mouth of the Creek than the other. The marks on the west line are upwards of thirty years old.

A. Williams, another witness for plaintiff, testified that he is a surveyor, and has been accustomed to survey grants. Spanish lines, well identified, are very rare. He ascertains the time a blaze has been made by the appearance of the wood grown over it. He has recently surveyed the Taylor grant—he followed the lines as surveyed by Mr. Irwin. The first line runs upon an old line, well defined on the west line of the claim—they are very old marks. The west line runs due north, which is very unusual for Spanish lines. The old line started from a gum. It extends north seventy-two chains being, witness supposes, the west boundary of Hogan's grant. He started from a gum stump, pointed out to him, not exceeding five chains from the St. Johns River—part of the blazes were grown over—should think them over twenty-five years old. He found no trees on the north line, and found no north-east corner tree—found no marks on the line running south. The majority of the marks on the west of the Taylor grant were a blaze and two chops.

Oliver Wood, another witness for plaintiff, testified that he is a practical surveyor, that he has run the lines of the Taylor grant. Commenced at a gum stump north side of M'Coy's Creek. Thomas Suarez showed him the stump.

About a year ago he ran the west line north forty chains. He found trees marked. They were old marks, but there were some new ones. At about forty-two chains there was a stake marked with a cross. At the side of the road near by was a small pine—neither could have been very old. He ran the next line east fifty chains—found no corner there. He ran the east line parallel with the first—it terminated about a half chain from the east line of Captain Ledwith's water lot. Has surveyed some of the lots in town. The distance from Market-street to Ocean-street is about seven hundred feet.

Francis J. Pons, another witness for plaintiff, testified that he was one of Mr. Irwin's chainmen—that they ran the first line north forty chains, the second one east fifty chains and the third one south about forty-eight chains. The lines were measured correctly.

Thomas Henderson testified that he is acquainted with the locality at the mouth of M'Coy's Creek. The point beyond and above the mouth of the Creek has made out further than it did fifteen years ago.

George C. Acosta, another witness for plaintiff, testified that the point at the mouth of M'Coy's Creek has filled out one hundred feet within the last five years.

The plaintiff then read in evidence a deed from John Masters to John Brady, dated 21st day of June, 1820, conveying to said Brady the land granted to the former by the Spanish Government; also a deed from John Brady to John Bellamy, dated 27th January, 1823, for the same land; also a deed from John Bellamy to I. D. Hart, dated 4th day of May, 1836, for the same land.

The defendant to sustain the issue on his part read in

evidence a deed from I. D. Hart to Hammond Libby, dated 25th of July, 1835, conveying the west half of lot No. 5 ; also a deed from Hammond Libby to the defendant, dated 21st May, 1836, conveying the same half of lot No. 5.

The defendant also read in evidence the record of a deed from I. D. Hart to the defendant for the other, or the east half of lot No. 5.

Defendant then offered in evidence a deed from Lewis T. Hogans and Maria his wife (who signs as Mary Hogans) formerly Maria Taylor, and others the heirs of Purnal Taylor, to I. D. Hart dated 28 May 1834, for part of the tract of land granted by the Spanish Government to the widow and heirs of Purnal Taylor. The introduction of this deed was objected to by plaintiff's councel on the ground that Mary Taylor was not Maria Taylor, and that said deed was not acknowledge by the said Maria or Mary Taylor according to law; whereupon Thomas Suarez was called by defendant who testified that he subscribed said deed as a witness thereto, that Maria Taylor was his sister and could not write—does not know who signed it for her. Witness was called to sign the deed and his sister acknowledged the deed. The deed was then admitted by the Court to be read to the jury on the question of boundary. To which plaintiff excepted. Defendant also offered in evidence another deed from said Hogans, and Maria his wife, formerly Maria Taylor, and the heirs of Purnal Taylor to I. D. Hart dated 15th of April 1836, for other part of the land granted by the Spanish Government to the widow and heirs of Purnal Taylor. To the introduction of which, plaintiff objected on the ground that it was not acknowledged by said Maria Hogans separately and apart

from her husband.  This objection being overruled said deed was admitted to be read on the question of boundary, to which plaintiff excepted.

Defendant also offered in evidence a deed from said Hogans and wife to I. D. Hart dated July 10th 1831, conveying another part of the tract of land, so as aforesaid granted by the Spanish Government.  The introduction of which was objected to on the ground of irrelevancy, but the Court overruled the objection and admitted the said deed to be read on the question of boundary.  To which plaintiff excepted.

F. J. Ross a witness for defendant testified that he was one of the Commissioners for laying out the town of Jacksonville about the year 1824.  John Bellamy and Benj. Chairs were the other Commissioners.  John Brady who claimed to own one part of the town site, and Hart who claimed the other part, were both present.  Brady purchased from John Masters and Hart from Hogans.  So they stated at the time.  Market street was assented to and agreed upon by both Brady and Hart as the boundary line between the lands owned by Hart on the west, and Brady on the east.  A tree was standing on the bank of the river at the foot of market street which was claimed by Hogans from whom Hart bought, to be a corner tree and as marking the point where the survey between the two tracts commenced.  The tree had marks upon it but witness cannot swear that it actually was the original corner tree.  Brady at first deemed it to be such original tree and there was some considerable dispute between them (Hart and Brady,) on the day the town was laid out, but it was at last agreed beween them that the tree above mentioned should be ta-

ken as the starting point and the commissioners should lay off that street as the dividing line between them. Before the Commissioners would proceed to lay off the town, the question was asked by the witness of both Hart and Brady if they had agreed to the street marked as market street, but which witness thinks was not at that time called market street, as the boundary line, and they distinctly stated they were so agreed. He states further that he purchased lots one and four in square two, west of Market street, on the same day the town was laid off, which he sold back to Hart. He may have also purchased lot No. five also west of Market street and bounded on the east thereby. He also purchased a lot from Brady. At the time the town was laid off, Hart was living in a house on or very near to what is marked on the plat as lot No. five, in square two. That in about a year Brady sold his interest to John Bellamy, who was one of the Commissioners for laying off the town, and that neither Bellamy nor Brady ever made any claim to any thing west of Market street, but on the contrary acquiesced in Market street as the boundary line. Witness never heard of there being any other line claimed until about a year ago or perhaps a little longer.

James McCormick, another witness for defendant, testified that he was present when the town of Jacksonville was laid out or a part of it. This was in 1822, he thinks. The commissioners were Major Chaires, Fancis J. Ross, John Bellamy, Stephens J. Eubanks, and perhaps others. Thinks John W. Roberts acted as clerk of the commissioners.— Thinks they had a surveyor—he was D. S. H. Miller.— Mr. Brady claimed on one side of Market street, and Col.

Hart on the other. They were both present· They commenced at the foot of Market-street. Hart and Brady each agreed to give one-half of the street. Miller said that was the corner. At the time the town was laid off, Col. Hart lived near what is now Mr. Fraser's office. Mr. Brady was living in the middle part of what is now Mr. Doggett's house, on the east side of Market-street.

Plaintiff's counsel objected to the admission of the testimony of Mr. McCormick on the grounds, first : that it was irrelevant to the question at issue, and calculated to mislead the jury ; Second : that it was an attempt to prove title to real estate by parol testimony ; And third, it was an effort to vary by parol testimony the boundary of the grant from the description given in the deed. These objections being overruled, the plaintiff excepted.

Defendant offered in evidence sundry deeds executed by I. D. Hart to divers persons, bearing date previous to the date of the deed from Hart to Mills in trust for Mrs. Doggett, covering lots embraced within the disputed boundary. The introduction of which was objected to by plaintiff for irrelevancy, which being overruled, the plaintiff excepted.

Plaintiff, by way of rebutting testimony, then offered in evidence a bond dated 23d December, 1840, from I. D. Hart to H. Ashlock, for titles to a piece of land on the western border of the Taylor grant, showing his ownership and occupancy of the same. To the introduction of which defendant objected, and the objection being sustained, plaintiff excepted.

The Court instructed the jury as follows :

"The present action of ejectment is brought for the recovery of a certain piece of land, known and distinguished

as lot No. 5 on the map or plat of the town of Jacksonville. The west half thereof is not claimed by the plaintiff, therefore the east half of said lot is only in defence, and our inquiries are directed to that portion of the case and no further. The plaintiff has shown a regular deed from Isaiah D. Hart to Wm. J. Mills in trust for her, and she claims that this half of said lot lies within the boundaries of said deed to said Mills, in trust for her.

"If the land in dispute does lie within the limits embraced in said deed, this would give her a perfect title, and entitle her to your verdict, unless the defendant has shown some evidence that could authorize the conclusion of the Court and jury that a better title is outstanding either in the defendant himself or in some other person. A plaintiff in ejectment must recover on the strength of his own title, and not on the weakness of the defendant's. It is all important that neither of us should be carried away by the appeals of counsel or sympathy for the parties, but take up the whole evidence in the case and upon it, render a verdict. The great question presented to you is, whether the land in dispute was included in the boundaries of the said conveyance from said Hart to W. J. Mills, in trust for said plaintiff. This deed recites " a certain tract of land situated in Jacksonville, Duval county, territory of Florida, and bounded as follows : on the south by St. Johns river, on the north and east by Hogan's creek, and on the west by lands granted to the heirs of Purnal Taylor and now (then) owned by I. D. Hart, which described as above was formerly granted by the Spanish Government to John Masters, and purchased by me (Hart) of John Bellamy, including fifty acres within the boundary aforesaid, and all of

said tract, be it more or less, except such parts as was sold and such parcels of the same as were legally deeded away according to the tenor of a deed made by John Brady to John Bellamy, and according to the tenor of a deed made by John B. to me for the above bargained premises, &c., in full confirmation of said deeds."

"The plaintiff shows the grant to said Masters and a survey thereof and the grant to Maria Taylor and a plat, which she claims to be a survey thereof, for the purpose of defining thereby the boundaries of said grants, claiming that the same established that the "Masters grant," bounded on the Taylor grant, " and that the premises in dispute are embraced within the calls of the survey of the Masters grant." The return of a survey made into the Surveyor-General's office or any other office or place to which it should be returned, and a lapse of twenty-one years afterwards, without any attempt being made during that interim to contravene or take exception to it, is conclusive evidence that it was regularly made.

"If from the evidence you find these surveys were returned by said George I. F. Clark into the Surveyor-General's office or archives of the Spanish Government in Florida, where they are found, and twenty-one years have elapsed without any attempt, during that time, to contravene or take exception to them, the law presumes they were regularly made.

"After so great a length of time has run around since the survey of these grants, circumstantial evidence tending to show the probability that the survey of either grant covered the land in dispute, is sufficient.

"Although some portion of the evidence respecting the

boundaries of these two grants is mere reputation or hear-
say, yet such evidence taken in connection with other evi-
dence, is entitled to respect in cases of boundary, where the
lapse of time is so great as to render it difficult if not im-
possible to prove the boundaries by the existence of the
primitive landmarks or other evidence than that of hear-
say.

"The highest regard is had to natural boundaries, and to
lines actually run, and corners actually marked at the time
of the survey or grant, and if the lines and corners of an
adjoining tract are called for, the lines will be extended to
them if they are sufficiently established, without regard to
the quantity included, whether the same be more or less
than the quantity expressed. The defendant has shown a
regular deed from Isaiah D. Hart to him of said east half
of said lot No. 5, dated subsequent to the deed under which
the plaintiff claims, which he claims is not included in the
said deed under which said plaintiff claims. In other
words, that the same was not conveyed by said Hart to
said Mills, in trust for said plaintiff.

"This as we have before stated, presents the great ques-
tion, whether the land in dispute was included in the
boundaries of the said conveyance from said Hart to said
Mills, in trust for said plaintiff. Parol declarations and
confessions of persons who, at the time, are owners or
claimants in possession of land, as to the true boundary line
between them, and assented to by them, are admissible
evidence in suits between those who claim under them, or
either of them, under subsequent title. Therefore, if you
find from the evidence that said Brady and said Hart, while
they or either of them were owners or claimants in pos-

session of the lands in dispute, made parol declarations and confessions as to the true boundary line, then such declarations and confessions are admissible as evidence in this cause against such owner or claimant in possession, and entitled to be considered by you as conclusive.

"If, however, you find from the evidence that said declarations and confessions were obtained by fraud or concealment, and they were not made with a true and full knowledge of the facts, then they are not entitled to such credit.

"You are the sole judges of the facts, and it is not only your right but your duty to find according to your views of the proofs.

"This action is to recover possession of the premises in dispute and not to recover damages, but form requires you should find some nominal sum. Therefore, if you find for the plaintiff, you will say the defendant is guilty in manner and form as the plaintiff against him has complained, and you do assess the plaintiff damages by occasion thereof.

"If you find for the defendant, then you will say, the defendant is not guilty of the trespass and ejectment in the declaration alleged."

To all which charging plaintiff's counsel, then and there excepted, and assign the same as cause of error.

The plaintiff's counsel then asked the Court to give the following charge to the jury, to wit:

"That if the admissions and confessions of the parties were made with ignorance of their rights under the law, then such admissions or confessions will not be binding upon the party making them or upon persons claiming

63

under him or them." Which was given accordingly.

The defendant's counsel then asked the Court to charge the jury as follows:

"I. That the plaintiff's claim in this case depends on the plat of survey of the lands made by Clark, the Surveyor-General—so far as the boundary is concerned.

"II. That the survey of Miller, made in 1817, as testified by Suarez and the lines marked by him, are not conclusive or binding upon either the plaintiff or defendant."

"III. That the royal title to Maria Taylor of September 18th, 1816, vested in her an absolute title to two hundred acres of land fronting on the river and between M'Coys' Creek and the point opposite St. Nicholas, even before the survey made by Clark in 1817."

IV. That the deed of Hart to Mills in trust for Mrs. Doggett, of the Masters grant, referring as it does to the deeds from Masters to Brady, and from Brady to Bellamy, and Bellamy to Hart, conveys only the lands, which were conveyed by these successive deeds and that therefore anything which would defeat the title of Brady, (such as thirty years acquiesence in a line, ) is a good defence in an action by Mrs. Doggett.

V. That when a deed is made of a tract of land, which is described by its name and not by natural land marks, it is competent for a jury to enquire what lands were intended by the name used, and that if they are satisfied from the evidence, that both the grantor and grantee understood a particular tract, the grantee takes that tract and no more.

VI. That when the boundary line between two contiguous estates has become doubtful, and the owner of one

of said estates afterwards acquires the title to the other, but resells the same by name and without defining the true boundary, both grantor and grantee are estopped to enquire what was the original boundary, but must abide by the line claimed by the grantor prior to his acquisition and during the time he held both titles.

VII. That a disputed question of boundary, is forever, put at rest by the vesting of both estates in the same person, and that all persons claiming under him, are absolutely estopped from asserting the boundaries to be other than he had uniformly declared it to be.

VIII. That the owner of two contiguous estates, has an absolute right to alter and change the dividing line between them, and if he afterwards sells either of them by name and not by mets and bounds, his grantee (if cognizant of the alteration,) takes the estate with the new boundary, and is not remitted to the old.

"IX That when two estates are vested in the same, owner and he sells one of them by name and not by metes and bounds it is not competent for his grantee to assert a claim to other lands than those generally known at the date of the conveyance by the name used therein, nor can he recover in ejectment by simply proving that before his immediate grantee acquired title, the lands in controversey were embraced in the estate by the name used in the conveyance to him.

" X. That although the quantity of land yields to course, distance, and natural objects, yet the quantity may and ought to be considered as a description by the Jury when the exact boundaries are difficult to ascertain."

Which instructions so asked by defendant were granted

by the Court, and to all which plaintiff excepted.

The Jury having rendered a verdict for defendant, plaintiff appealed.

*Felix Livingston* and *Philip Fraser* for Appellant.

*Geo. W. Call, Jr.* for Appellee.

BALTZELL, C. J. delivered the opinion of the Court.

This is an action of ejectment instituted by plaintiff, Mrs. Doggett, to recover a lot of ground lying in the city of Jacksonsville. The case was tried by a jury, who found a verdict for defendant under instructions given by the Circuit Court. These being excepted to at the trial, together with the ruling of the Court in the exclusion and admission of testimony also excepted to, constitute the questions for the determination of this Court. They have been argued with ability on both sides, showing a degree of preparation and industry in the management of the case not often surpassed.

We have given to it a very careful consideration, due alike to its importance not only in the individual case, which does not involve property of very large amount, but in numerous other cases depending upon its determination; and we now proceed to announce the result of our deliberations. At the instance of defendant the Court admitted deeds from Lewis Hogan and wife (who was Maria Taylor, the grantee in a concession by the Spanish Government, more particularly alluded to hereafter,) and the heirs of Purnal Taylor to Isaiah D. Hart, which was objected to by plaintiff on the ground that Mrs. Hogans was not examined, and did not acknowledge the deeds apart from her husband. That they were insufficient to convey her right is admitted. The question arises, may not the deeds be

available as evidence in the case notwithstanding this objection, and we think they may. They are obviously good for the interest of the husband during his life time and for that of the heirs after her death. The former was tenant by the courtesy and to that extent his interest was conveyed. This at all events gave color of right to defendant claiming under Hart, and is sufficient for the purposes of this action.

The fourth error assigned is to the receipt of certified copies of the proceedings of the Board of Land Commissioners in St. Augustine. If there were any such before the Court on the trial of the case, they are not to be found in the copy of the record before us. The fifth and sixth errors relate to the admission of the deposition of Francis J. Ross and the evidence of John McCormick, and constitute the leading points in the case. To determine them properly it is necessary to have a clear conception of the state of the case as presented by the evidence at this stage of it.

The plaintiff adduced in evidence a deed from Isaiah D. Hart to Mills in trust for herself, dated December 18th 1836, she being at the time a *feme covert,* though now a widow and a *feme sole,* conveying a tract of land known as the Masters grant. This latter was founded upon an application to the Governor of Florida, dated 18th November, 1816, representing the straightened circumstances of the petitioner, and praying for a grant of one hundred acres of land of vacant hammock on the north side of St. Johns river, opposite the battery of St. Nicholas, and bounded by Mr. Daniel Hogan's plantation in the neighborhood of a creek.

A note attached to the order of the Governor acceding to the petition, is to this effect: "By a decree rendered at the instance of the petitioner of the 2d of last month, there was granted to him fifty acres of land at the south point of St. Johns bar, distant about one mile from Quesados battery, which grant has been made to him in consequence of his having proved that up to the present time he had located but fifty acres of the hundred granted him."

The survey made in obedience to the decree is in these terms:

"I, Don George Clark, Lieut. of the militia of St. Augustine, of Florida, and Surveyor-General, appointed by the Government of the said place and province, do certify that I have measured and bounded for Don Juan Masters fifty acres of land on the north side of the St. Johns river, at a place called Cowford, or Ferry of the King's road, being a part of one hundred acres granted to him by the Government on the 13th December, 1816, which survey agrees with the following plan and its original, which is recorded in the book of surveys of land under my charge." Fernandina, 21st February, 1817. Signed George I. F. Clark. [The plat of survey describes the first line as running from the confluence of Hogan's creek and St. Johns river west thirty chains to the second line, which beginning on the St. Johns river at an oak, runs north 33 1-3 chains to a pine. Outside of the second line or west boundary of this grant are the words "Maria Taylor's land."]

Plaintiff claims that her western line connected with a grant made to another party, by virtue of a clause in the deed made to her by Hart, in these words: "All the right and interest of said Hart to a tract of land

bounded on the south by St. Johns river, on the north and east by Hogan's creek, and on the west by the lands granted to the heirs of Purnal Taylor, which described as above was formerly granted by the Spanish Government to Juan Maestre, and by Hart purchased from John Bellamy, &c., including fifty acres, &c."— The plaintiff adduced and read in evidence to the jury a grant to Maria Taylor, the widow of Purnal Taylor, for 200 acres " commencing on the north side of St. Johns river, at the mouth of M'Coy's creek, running thence 40 chains north to a pine, thence 50 chains east to a pine, thence 40 chains south to an oak on the St. Johns river."

She then introduced evidence of Surveyors and others to show that the beginning of this latter tract on its western side was at a stump near McCoy's Creek, and that blazes and chops were found on a line running North from it. No corner was found here, and the line was made to terminate agreeably to the distance; the remainder of the line was run agreeably to course and distance, no corner nor blazes or chops having been found on the last and eastern line.— Surveyed in this manner, this grant on its eastern side next to the Masters grant, terminated some two or three squares or blocks west of the lot in contest which lies on and directly west of Market street.

The position of the plaintiff obviously then is that the eastern line of the Taylor grant terminates at a point west of Market street, thereby throwing the lot in contest within the Maestre grant owned by her, and this she hopes to do by establishing a line as we have described, claimed as the true line by its chops and blazes on the west, and the remainder according to course and distance. Under such a

state of the case it is very clear that defendant had the right to adduce evidence showing that this line did not commence nor terminate as contended for, that on the contrary the actual survey terminated at a corner as its boundary and embraced Market street and of course the lot in question.

This he proposes to do by the deposition of Francis J. Ross and the testimony of John McCormick. Ross proves " that he was a commissioner for laying out the town of Jacksonsville about the year 1824, that Brady claiming a part of the town site, and Hart another part, were present— that there was a tree standing on the bank of the river *at the foot of Market street*, which was claimed by Hogans from whom Hart had bought, to be a *corner tree—the tree had marks upon it*, but witness cannot swear that it actually was the corner tree. Brady first deemed it to be such original tree and there was considerable dispute between them."

McCormick says, "he was present when the town of Jacksonville was laid out or a part of it, this was in 1822—he thinks the Commissioners were Major Chaires, Francis J. Ross, John Bellamy, Stephen J. Eubanks and perhaps others—thinks John W. Roberts acted as clerk of the commissioners—thinks they had a surveyor, he was D. S. H. Miller—he said the corner was at the foot of Market street."

Here then we have on the eastern line a tree with marks upon it claimed by Hogan the former owner of the Maria Taylor grant to be a corner tree, insisted upon by the then owner Hart and in a degree admitted by Brady the owner of the Maestre grant—a tree existing in 1822 or 1824, when

the town was laid out by the commissioners, only five or seven years after the survey. In addition to this we have the fact that D. S. H. Miller a surveyor in the employ of the commissioners said " that was the corner"—the same person (if we are not mistaken though the proof is not entirely distinct) who made the original survey and whose declaration under the circumstances would be entitled to weight.

Now, that this is material it is sufficient to state that the establishment of a corner tree at Market street fixes the eastern line of the Maria Taylor grant so as to embrace the lot in contest within its limits, and excludes it from the Maestre grant. Taking it that plaintiff has succeeded in fixing the western line of the same grant by a corner tree and blazes and chops, this testimony if believed by the Jury may be regarded as settling the eastern line at the foot of Market street and upon grounds supported by undeniable principles long since established in cases of disputed boundary.

"It is a general principle that the course and distance must yield to natural objects called for in the patent. All lands are supposed to be actually surveyed, and the intention of the grant is to convey the land according to that actual survey; consequently if marked trees and marked corners be found conformably to the calls of the patent, or mountains, or any other natural objects, distances must be lengthened or shortened and courses carried so as to conform to those objects. The reason of the rule is, that it is the intention of the grant to convey the land actually surveyed, and mistakes in course or distance are more proba-

64

ble and frequent than in marked trees, mountains, rivers, or the natural objects capable of being clearly distinguished and accurately described." McIver's Lessee vs. Walker, 9 Cranch, 173. 3 Cond. S. C. R., 338. 6 Wh. 58. 2 Hilliard, Real Prop., 254.

Nor is this all that Ross and McCormick prove. Ross says: " There was considerable dispute between them, (Hart and Brady) but it was at last agreed between them that the *tree* above mentioned should be taken as the *starting point*, and the Commissioners should lay off that street (Market-street) as the dividing line between them. Before the Commissioners would proceed to lay off the town the question was asked by the witness of both Hart and Brady, if they agreed to the street marked as Market-street, but which witness thinks was not at that time called Market-street, as the boundary line, and they distinctly stated they were so agreed—that they laid off the town and the streets and squares as marked by the Commissioners—he bought lots one and four in square two on the same day the town was laid off, (also directly west of Market-street) and sold them back to Hart. At this time Hart was living at a house on or very near to what is marked on the plat as lot No. 5 in square two, also directly west of Market-street. He further says that in about a year Brady sold his interest to John Bellamy—that neither Brady nor Bellamy made any claim to anything west of Market-street, but on the contrary acquiesced in it as the boundary line, and witness never heard of there being any other line claimed until about a year or two ago, or perhaps a little longer, and witness bought lots of Brady at same time."

McCormick says: " Mr. Brady *claimed on one side of*

*Market-street and Col. Hart the other*—they were both present—they commenced at the foot of Market-street.—Hart and Brady each agreed to give one-half of the street. At the time the town was laid off Col. Hart lived near what is now Mr. Frazer's office—Brady in the middle part of what is now Mrs. Doggett's house on the east side of Market-street."

We have then a dispute between the owners as early as 1822 or 1824—an agreement to lay out a town on their joint lands (and the town is laid out with one block on the lands of Brady east of Market-street and two to the west on the lands of Hart)—an agreement between them that Market-street shall be the boundary, and each should give half the land for the street; in addition to this, possession by Hart as early as 1822 or 1824 and sales and purchases of lots under this agreement, acquiescence in by the owners of the Masters grant, and by everybody to the time of the institution of the present suit, a period of upwards of thirty years.

That this admission—agreement as to the corner tree and boundary—connected with the action of the parties and others in laying off a town, and buying and selling lots, independent of the acquiescence for thirty years, with the adverse possession of Hogans and Hart and those claiming under them for nearly forty years, were proper evidence for the jury, we cannot hesitate for a moment in declaring.

"There are other declarations which are admitted as original evidence, being distinguished from hearsay by their connection with the principal fact under investigation. The affairs of men consist of a complication of cir-

cumstances so intimately interwoven, as to be hardly separate from each other. Each owes its truth to some preceding circumstance, and each has its inseparable attributes and its kindred facts, materially affecting its character, and essential to be known in order to a right understanding of its nature. These surrounding circumstances, termed the *res gestœ*, may always be shown to the jury along with the principal facts, &c." 1 Greenleaf, §108–n.

"There has been a difference of opinion in regard to the declarations of persons in possession of land, but it is now well settled that those in disparagement of the title of the declarant are admissible as original evidence, &c. But no reason is perceived why every declaration accompanying the act of possession, whether in disparagement of the declarant or otherwise, if made in good faith, should not be received as part of the *res gestœ*." Ibid 121.

"The declarations of Smith (who had been in possession of the premises and from whom defendant derived title) while in possession, as to his title, were admissible for defendant; they would have been good against him, and are competent against all who claim under him." 4 John. 229; 1 Ibid 343.

"It is not to be controverted that parties whose rights to real property may be perfected, and the boundaries of which may be susceptible of certain and precise ascertainment, may by their acts conclude themselves by establishing other and different boundaries." 4 John. 140; 2 Caine, 146; 10 John, 377.

"Acquiescence in an erroneous location for eighteen years is conclusive upon a party making or acquiescing in such

location." 19 Pick. 445; 6 Wen., 467; Hilliard Real Property, 229.

"Admissions which have been acted upon by others are conclusive against the party making them, in all cases between him and the person whose conduct he has thus influenced." 1 Greenleaf, §207.

"The admissions of one person are also evidence against another, in respect of privity between them; the term privity means natural or successive relationship to the same right of property, &c." Ibid. 189.

"In other cases where the party by his admissions has qualified his own right, and another claims to succeed him, he succeeds only to the right as thus qualified when his tile commenced, &c." Ibid.

"On the same principle other contemporaneous declarations of occupancy have been admitted as evidence of the nature and extent of their title against those claiming in privity of estate." Ibid. §189.

"Long continued occupation under a grant may control courses and distances where no monuments are referred to, or when those referred to are gone." 2 Hilliard R. P., 347; 9 Pick., 520; 5 Green., 489.

The admission of this testimony is by no means, we think, obnoxious to the objection of proving title to real estate by parol, or varying the boundary of the Maestre's grant from the description given in the deed of trust to Mills. It conduces to establish the eastern line of the Taylor grant differently to where the plaintiff would locate it. Supposing the eastern line unsettled and the boundary in dispute, it settles that it was competent for the parties to terminate the contest and adjust and settle it.

For the reasons just stated, we do not think the Court erred in admitting in evidence to the jury the deeds enumerated in the bill of exceptions from Isaiah D. Hart to various persons, bearing date previous to the trust deed from Hart to Mills. These were a fair consequence of the agreement with Brady establishing the eastern boundary line. They seem to have been recorded, and may properly be regarded as part of the *res gestœ*.

We do not perceive the force of the application for the permission to read the bond of Ashlock to the jury; there is nothing on the face of it, as we understand it, to show "acts of ownership by Hart over the extreme west end of the Maria Taylor grant as claimed by him." The boundary to the south by M'Coy's creek is the only expression in the bond showing any connection with the grant alluded to. It was therefore we think properly excluded.

Nor do we think there was just exception to the charge as to the surveys returned by Geo. I. F. Clark. They had been read in evidence to the jury by plaintiff herself, without objection of defendant, so that their authenticity was not a subject of question, but would seem to have been admitted by both sides. There was no attempt to impeach their verity, and no instruction was needed in their support.

We do not think the instruction that " after so great a length of time circumstantial evidence tending to show the probability that the surveys of either grant covered the land in dispute is sufficient," can be maintained, and very probably goes beyond what the learned Judge himself would think appropriate, on reflection.

There is no error in the ruling that although some por-

tion of the evidence respecting the boundaries of these grants is mere reputation or hearsay, yet such evidence, taken in connection with other evidence, is entitled to respect in cases of boundary when the lapse of time is so great as to render it difficult, if not impossible, to prove the boundary by the existence of the primitive land marks or other evidence than that of hearsay.

Whilst the ruling as to the effect of the parol declarations and confessions of Brady and Hart are not stated so clearly and fully, and in connection with other acts as to the boundary line, as we might approve, yet it will be seen from what we have already stated, that the instruction expresses substantially the sentiments and opinions of this Court as to this testimony. We do not understand the Court in the instruction as to plaintiff's claim depending on the plat or survey of the lands made by Clark, as rejecting the plat and lines run and marked; if considered in this latter point of view it would be evidently erroneous. The Court had already instructed as to natural boundaries and lines already run, as well as to the effect of the admissions of the parties, &c.

Nor do we think there was error in the charge that the survey of Miller, of 1817, as testified by Suarez, and the lines marked by him, are not conclusive or binding upon either plaintiff or defendant. To assume the conclusiveness of this testimony would be to take from the jury the decision of the credibility and sufficiency of the testimony of Suarez.

Whether the royal title to the Maria Taylor grant vested an absolute title before the survey, was a question not connected with the merits and as far as we perceive, of no

practical value in the case. The grant was admitted to be good with the survey, both parties claiming under it, and no question raised by either as to its validity. Where then the propriety of raising the abstract question, that at some point of time and before the survey, it was void for uncertainty.

The 16th, 17th and 18th errors object to the ruling of the Court as to the effect of the deed of Hart to Mills for plaintiff; contending that plaintiff was entitled by that deed to connect her western boundary with the eastern line of the Taylor tract, that this description is by metes and .bounds, and that Hart, and all persons claiming under him are estopped from setting up any other claim than the one recited in the deed.

•It will be seen at once that the establishment of the eastern line of the Maria Taylor tract at Market-street relieves the case from all objection predicated upon this view.

But again, we are of opinion, after due reflection, that this deed must be considered in connection with and in reference to the facts and circumstances preceding it; we allude to those deposed to by Ross and McCormick which we give weight to, as the verdict has been in favor of defendant, and to the acquiescence of the parties to the time of the sale to Mrs. Doggett. This will give to the Maestre tract some thirty acres beyond the amount of fifty acres granted by the Spanish Government, preserve the rights of parties existing now for near forty years undisturbed, and without violating any principle of law or equity. Were this not a satisfactory conclusion to our minds, we should most probably be constrained to hold that the call in the deed to unite

the two tracts was a mis-description inconsistent with the leading and main and principal object of the deed, which was to convey the Maestre grant derived from the Spanish Government and from him to Brady, Bellamy and Hart to plaintiff. And there is much reason and foundation for such opinion. It is very obvious that these two grants do not unite by any call in common; they were not surveyed so as to unite, and their very appearance on the plat repudiates such connection. The call for course and distance of the Maestre grant gives the full compliment of fifty acres. To unite it with the Taylor grant to the full extent contended for, would probably give eighty acres. Nor is it pretended that there are natural calls to enlarge it, either that the oak on the river or the pine on Hogan's creek, the western line, were or ever were claimed by any body to be the corner tree of or on the eastern line of the Taylor tract. True, we perceive on the plat of the surveys, outside of the boundaries, the words "Juan Maestre lands" on the Taylor plat, "Dona Maria Taylor's lands" on the Maestre plat. It would be strange indeed that these should be construed as extending the boundary of either, but suppose they do, is the extension to be on the part of the Maestre grant and not on the other? Had Hart in his deed conveyed the lands in the Maestre grant, and any other intermediate land between that and the Maria Taylor grant as surveyed by course and distance, there would be greater room for the position. Admitting that there was doubt even upon the Ross and McCormick testimony, as to the corner tree and eastern line of the Taylor grant, it was competent for the owners to adjust it and to settle and fix the lines, and to treat with persons in buying and

65

selling in reference to such line as established, especially in a case of such notoriety as the present.

In the construction of a grant the Court will take into view the attendant circumstances, the situation of the parties, the state of the country and the thing granted. 2 Hilliard Real Prop. 328; 3 Mass., 352; 4 Ibid., 205; 10 Ibid., 459.

We then do not think these objections tenable, though not altogether concurring in the propriety of the instructions themselves. We do not agree to the instruction that in a case of a sale by the owner of one of two contiguous estates, without defining the true boundary, the grantee is estopped to inquire into the original boundary, but must abide by the line claimed by the grantor prior to his acquisition.

Nor do we assent to the instruction that a disputed question of boundary is forever put at rest by the vesting of both estates in the same person, and that all persons claiming under him are absolutely estopped from asserting the boundary to be other than he had uniformly declared it to be. This would be giving to declarations of a party a sanction and verity far beyond what has ever been claimed for them, and would substitute parol, fluctuating testimony of oral declarations, in place of writing.

Nor do we assent to the ruling that if the owner of two contiguous estates alter the dividing line between them, and afterwards sell either of them by name, his grantee, if cognizant of the alteration, takes the estate with the new boundary. Nor to the next, in which the effect of selling by name is also stated. We regard them as inapplicable

to the case, not justified by the testimony and calculated to mislead.

If the instruction that although quantity yields to course and distance, and yet quantity may and ought to be considered as a description when the exact boundaries are difficult to ascertain, be merely that this may be considered by the jury amongst other things, we may not think erroneous, but it should be so qualified.

Whilst then several of the instructions given to the jury have been found erroneous, yet the inquiry arises as to the finding and whether the judgment should be reversed on account of them. The rule is that there must be some possibility of injury arising out of the matter excepted to. 2 Hill N. Y., 210; Cowen & Hill's Notes to 1 Phil. Ev., 787–8.

An erroneous instruction to the jury cannot be assigned for error, if the verdict is sustained by the evidence. 6 Blatch., 258.

Where a judgment effects the proper results, no matter by what erroneous reasoning it may have been induced, it will not be reversed. 11 Ala., 149.

Although instructions to the jury are not correct, yet if the verdict is right, judgment will not be reversed. 6 B. Mon., 44.

When the jury have given a correct verdict, it will not be set aside for erroneous instructions of the Court, when instructions correctly given on those points could not have changed the result. Hill vs. Calvin, 4 How. Miss. R. 231.

Tested by these rules we are of opinion that the verdict is fully sustained by the evidence—that it is right upon the

law and facts of the case, and cannot perceive that the erroneous instructions given can have induced to any injury in the case.

The judgment will therefore be affirmed with costs.