CHRISTIAN THIESEN, *Plaintiff in Error*, v. GULF, FLORIDA & ALABAMA RAILWAY COMPANY, *et al., Defendants in Error*.

Opinion filed November 3, 1917.

Petition for rehearing granted January 14, 1918.

1. Private ownership of land riparian to navigable waters in this State extends ordinarily to high water mark.

2. While a verdict should not be directed for one party when there is evidence on which the jury may lawfully find for the opposite party, yet where the burden is on the plaintiff to prove all the elements essential to sustain his claim to relief, and he fails to make such proof, a verdict may be directed for the defendant.

Judgment affirmed.

## ON REHEARING.

1. At common law lands which were bounded by and extended to the high water mark of waters in which the tide ebbed and flowed were riparian or litteral to such waters.

2. The title to the soil under the waters where the tide ebbs and flows and in this State all navigable waters, between high and low water mark is in the State of Florida subject to the powers of Congress to regulate commerce. The title to such land however is held by the State in trust for the people who have the rights of navigation, fishing, bathing and commerce upon and in the waters.

3. At common law a riparian proprietor whose land extends to high water mark of tide waters had the right of ingress and egress to and from the lot over the waters upon which his land bordered. In this State he enjoys such right and that of unobstructed view over the waters and in common with the public the right of navigation, bathing and fishing in such waters.

4. A riparian owner of lands that are bounded by or extend to the high water mark of tide waters or navigable streams and lakes has no right without consent of the State to erect or build any structure upon the submerged land between the ordinary high and low water marks of such waters.

5. A declaration in an action for damages for interfering with one's rights as a common law riparian owner of land on a bay, which declaration alleges a right in the abutting land owner to build wharves, piers and docks upon the submerged land to the channel of the bay may be treated as a valid declaration by eliminating the allegations as to the right to build wharves, docks and piers to the channel as surplusage.

6. The American State Papers are received in evidence without other proof of their authenticity than the published volume.

7. The rights of a riparian owner at common law constitute property of which such owner cannot be deprived by the State under the Constitution, without just compensation.

8. Chapter 4802 Laws of Florida, 1899, entitled "An Act to grant the water front of the City of Pensacola" is ineffectual to justify a railroad company under a grant from the city of the submerged land between high and low water mark lying

in front 'of the land of a riparian owner, in depriving such riparian owner of his common law rights as such without just compensation.

Judgment reversed.

*Sullivan & Sullivan* and *John S. Beard*, for Plaintiff in Error;

*Blount & Blount & Carter* and *Philip D. Beall*, for Defendants in Error.

PER CURIAM.—In an action to recover damages for filling in from the shore line towards the channel opposite plaintiff's land upon the waters of Pensacola Bay in Esambia County, Florida, the court directed a verdict for the defendants and the plaintiff took writ of error to the final judgment for the defendants.

The statute under which the action is brought is as follows:

"643.   An act entitled 'An act to benefit commerce, approved December 27, 1856, and the grants therein made shall remain in force, which act is as follows:

" 'Whereas it is for the benefit of commerce that wharves be built and warehouses erected for facilitating the landing and storing of goods; And whereas, The State being the proprietor of all submerged lands and water privileges within its boundaries, which prevents the riparian owners from improving their water lots; therefore,

" 'The State of Florida, for the consideration above mentioned, divests itself of all right, title and interest to all lands covered by water, lying in front of any tract of land owned by a citizen of the United States, or by the United States for public purposes, lying upon any

navigable stream or bay of the sea or harbor, as far as to the edge of the channel, and hereby vests the full title to the sa·e in and to the riparian proprietors, giving them the full right and privilege to build wharves into streams or waters of the bay or harbor as far as may be necessary to effect the purposes described, and to fill up from the shore, bank or beach as far as may be desired, not obstructing the channel, but leaving full space for the requirements of commerce, and upon lands so filled in, to erect warehouses or other buildings, and also the right to prevent encroachments of any other person upon all such submerged lands in the direction of their lines continued to the channel, by bill in chancery, or at law, and to have and maintain action of trespass in any court of competent jurisdiction in the State, for any interference with such property, also confirming to the riparian proprietors all improvements which may have heretofore been made upon submerged lands, for the purposes herein mentioned.'"

"644. Nothing in this article contained shall be so construed as to release the title of the State of Florida, or any of its grantees, to any of the swamp or overflowed lands within the limits of the same, but the grants herein contained shall be limited to those persons and bodies corporate owning lands actually bounded by, and extending to low water mark, on such navigable streams, bays and harbors." Secs. 643, 644 Gen. Stats. 1906, Compiled Laws 1914.

Without objection on the part of the defendants, the plaintiff offered in evidence a written conveyance by Spanish authority dated December 31, 1813, covering "One Lot known by the number 369 (three hundred and sixty-nine) containing ninety-five feet front by one hun-

dred and thirty-one feet three inches in depth fronting
on the Bay." Conceding, but not deciding, that it suf-
ficiently appears that title to the described land passed
by successive conveyances or otherwise to the plaintiff,
yet in order to maintain this action under Section 643
General Statutes of 1906, the plaintiff must have shown
that the described land was "actually bounded by and
extended to," the waters of a "navigable stream or bay
of the sea or harbor." Sec. 644 Gen. Stats. 1906. This
is necessary to give to the plaintiff the statutory rights
that under section 643 of the General Statutes of 1906,
accrue to stated riparian owners in and to the "lands
covered by water, lying in front of any tract of land
*   *   * lying upon any navigable stream or bay of
the sea or harbor." While the expression "fronting on the
Bay," contained in the above mentioned conveyance may
be taken in connection with other circumstances to indi-
cate a boundary, it may also indicate aspect or location
with reference to outlook. Alden v. Pinney, 12 Fla.
348. Taken alone the words "fronting on the Bay" cer-
tainly cannot be held to be sufficient to show that the
land was "actually bounded by, and extended to" the
waters of a navigable "bay." This being so, it was
incumbent upon the plaintiff to show by evidence that
the described land was "actually bounded by, and
extended to" the waters of a navigable stream or bay
of the sea or harbor.

It appears that a Lot numbered 368 lies north of Lot
369, which Lot 368 extends north to Zarragossa Street.
It also appears that a "dummy" railroad track now exists
between the water and the uplands of Lot 369. In the
plaintiff's chain of title the description is "East half of
lots three hundred and sixty-eight and three hundred

and sixty-nine in block one, containing forty feet front on Zarragossa Street and extending back two hundred and sixty-one 3-12 feet to the Bay of Pensacola and fronting thereon forty-seven 6-12 feet be the front and depth more or less." The dimensions of lot 368 are not given in the testimony. A map in evidence seems to indicate that lot 368 is 130 feet north and south. The bill of exceptions shows that the plaintiff testified, *viz*: "I measured the East side of Lot 369 from Zarragossa Street. I measured from Zarragossa 368 and continued through lot 369 to the water. I measured the west side in the same way. I measured one straight line, from Zarragossa Street, practically the middle of the block; the alley way, to the inside of the dummy track, 261 feet. It was 261 feet inside of the dummy track; just inside one rail, between the two rails. It was about 25 or 30 feet from there to the water before the G. F. & A. filling in was constructed." This does not show the southern boundary of Lot 369 to be "actually bounded by and extending to" the waters of a navigable bay. The plaintiff offered no direct testimony that in 1856 when the riparian statute was enacted or since then, the lot was in part bounded by and extended to the waters of a navigable bay.

Frank Caro testified on behalf of plaintiff: "I have known that property since 1882. There was a fence running east and west, but there was a lot run down to the bay." "There was no fence to the south. In fact it was open to the bay."

Another witness, C. P. Bobe, whose grandfather had owned the lot, testified that "This lot came down pretty close to the water or to the beach, before the wharf or the terminal track was built. My recollection is that

the lot did not go clear to the water  *  *  *  about five feet; nearly to the beach." On re-direct: "I could not say how far the lot went down to the water. I do not know where the lot line was on the south side."

Mr. Albert Riera testified on, re-direct: "I cannot state whether or not this lot ran down to the ordinary high water." This testimony, as well as that of other witnesses, does not show that Lot 369 actually extended to the waters of the Bay. There is testimony that the plaintiff and his predecessors in occupancy of Lot 369 used the submerged lands in front of the lot, with wharves, &c., but this use does not confer riparian rights under the statute. The lot must be actually bounded by and extended to low water mark of the navigable bay for the riparian rights under the statute to attach. The maps put in evidence by both parties indicate that the lot did not extend to the waters of the bay.

In 1892 the predecessor in title of the plaintiff executed to The Pensacola Terminal Company a lease of "a right of way fifteen feet in width along and across the water front of the Bay of Pensacola, City of Pensacola, said State and County, now owned by the party of the first part, south of the premises now owned, occupied and under enclosure by the party of the first part, known and described as the East one-half of Lot number three hundred and sixty-nine (369) in Block number one (1), according to the plan of the Old City of Pensacola, in said State and County, fronting forty-seven (47) feet front on the Bay, of Pensacola to the edge of the channel of said Bay, the said right of way to extend from the Eastern to the Western boundaries of the said described property of the party of the first part." This description is not of a lot actually bounded by and

extending to the waters of the bay. It may be regarded as defining the location of the property leased to the Terminal Company for its railroad track "south of the premises now owned" by the lessor. The conveyance to the plaintiff in 1896 is of the "East half of lots three hundred and sixty-eight (368) and three hundred and sixty-nine (369) in Block one (1) of the Old City of Pensacola containing a frontage of forty (40) feet on Zarragossa Street and running through to Pensacola Bay, being two hundred and sixty-one 1-4 feet and having a frontage on said bay of forty-seven and a half feet." This does not define a boundary as extending to the waters of the bay, even if that could avail when the original Spanish grant was of a lot "fronting on the Bay," which is not shown to have carried title to land "actually bounded by and extending to low water mark" of the navigable bay, as required by the statute quoted above conferring riparian rights. Private ownership extends ordinarily to high water mark. Merrill-Stevens Co. v. Durkee, 62 Fla. 549, 57 South. Rep. 428; Ker & Co. v. Couden, 223 U. S. 268, 32 Sup. Ct. Rep. 284; United States v. Pacheco, 2 Wall. (U. S.) 587.

The plaintiff's claim is predicated upon the grant of riparian rights contained in Chapter 791 Acts of December 27, 1856, entitled "An Act to Benefit Commerce," Sections 643, 644 General Statutes of Florida, 1906, Florida Compiled Laws, 1914; and the defendants' claim is based on Chapter 4802 Acts of 1889, entitled "An Act to Grant the Water Front of the City of Pensacola."

While a verdict should not be directed for one party when there is evidence on which the jury may lawfully find for the opposite party, yet where the burden is on the plaintiff to prove all the essential elements to sustain

his claim to relief, and he fails to make such proof, a verdict may be directed for the defendant. In this case the burden was on the plaintiff to affirmatively show that Lot 369 was actually bounded by and extended t) 'ow water mark of the Bay. This showing was not made, and there was no error in directing a verdict for the defendant. See Bass v. Ramos, 58 · Fla. 161, 50 South. Rep. 945.

Judgment affirmed.

TAYLOR, WHITFIELD, ELLIS AND WEST, J. J., concur.

BROWNE, C. J., dissents.

BROWNE, C. J., dissenting.—I regret that I cannot concur in the decision in this case, but I am too firmly convinced by the evidence, both documentary and parol, that the lot in question extended to and was bounded by the Bay, and that Thiesen was a riparian owner, to do otherwise. The earliest deed introduced in evidence in support of plaintiff's title was one from Lorenzo Vitrain, syndic, to Antonio Montero dated December 31st, 1813, and contained this description: "One lot known by the number 369 (three hundred and sixty-nine) containing ninety-five feet front, by one hundred and thirty-one feet three inches in depth, fronting on the Bay."

The majority of the court hold that "Taken alone the words 'fronting on the Bay,' certainly cannot be held to be sufficient to show that the land was actually bounded by, and extended to the waters of a navigable Bay."

In view of the testimony as to the south boundary of

this lot, which to my mind clearly proves that the lot was actually bounded by and extended to the waters of the Bay, I cannot see why we should discuss the effect of the description when "taken alone." Nevertheless, I contend, that even "taken alone," the language used fully describes a lot bounded by and extending to the waters of the Bay. "Having a front on" or "fronting on," are apt terms to describe the boundaries to real estate. Thus, a lot described as "having a front on," or "fronting on" Monroe Street, means a lot extending to and bounded by such street. The natural, common sense meaning of these words is boundary and not aspect, and before we change the common sense meaning of words, and give them a strained and unusual one, it should plainly appear from the instrument itself that such was the intention, or from facts and circumstances which irresistably force the latter construction. Where a deed conveys "one lot known by the number 369 (three hundred and sixty-nine) containing ninety-five feet front, by one hundred and thirty-one feet three inches in depth fronting on Monroe Street" the natural meaning is that it conveyed a lot actually bounded by and extending to the street, and if after taking his one hundred and thirty-one feet three inches, there remained a strip between that point and the street, the grantor would take to the street; for there is no rule of construction more clearly settled than that courses and distances must yield to natural objects, and where they conflict, the distances must be contracted or expanded to accord to the monuments. In this case a map was introduced which showed lot 369 ending before it reached the water, but it is obvious that the party who made the plat was not familiar with this rule of construction, and arbi-

trarily limiting the depth of the lot to the course and distance described in the deed, instead of extending it to the natural object (the Bay), cannot set aside a rule of construction enunciated by Chief Justice MARSHALL in McIver's Lessees v. Walker, 9 Cr. 173 and followed with- out exception by all the courts of the country where the question has arisen, including Florida. Doggett v. Willey, 6 Fla. 482. To my mind the words used in this deed are not ambiguous, and leave no doubt about whether boundary or aspect was intended, but if so, there remains the strong circumstance that neither Vitrian nor his heirs ever made claim for the strip between the upland and the Bay, but that for over one hundred years, Thiesen and his predecessors in title claimed the strip, and exercised all the rights of ownership undis- turbed by anyone. The law does not recognize such a condition as land without an owner, and if Vitrian did not part with the title to the strip between the upland and the Bay, he and his heirs lost all claim by reason of the open, notorious possession under claim of owner- ship of Thiesen and his predecessors in title for an hun- dred years. This seems to dispose of the contention, but I am not satisfied to let it rest there. If there is any ambiguity or doubt as to whether Vitrian by the use of the words "Fronting on the Bay" intended to grant the space between the upland and the Bay, he or anyone claiming under or through him ought not to be per- mitted to deprive Thiesen of the premises or his rights, under the rule of construction that when there is an uncertainty in a deed about what is meant, we should interpret the words against the vendor, because it was in his power and it was his duty to use such words as to leave no room for doubt.

The construction which I have placed on the words "fronting on the Bay," is well supported by the authorities. In the case of Crane v. French, 50 Mo. App. 367, it was held in order that a lot should be regarded as "fronting on the street," it must actually extend to and be bounded by the street. In the case of Proctor v. Maine Central R. Co., 96 Me. 458, 52 Atl. Rep. 933, the description in a deed to a lot of land was before the court for construction; it read: "Granted to Deborah Mills the first thirty-acre lot toward the Round Cove as it is now laid out, with a road to be allowed upon the bank, front thirty rod, and northeast by east into the woods eight score rod." The case hinged on whether the words "front thirty rod" extended the lot to Fore river, and the court held that it did, and said: "Besides, the descriptive language of the grant itself, 'front thirty rods,' is appropriate to land lying adjacent to the water, and is not appropriate to any other condition shown to have existed at the time of the grant. A lot of land may be said to 'front' on water, but not usually to 'front' on another piece of land. It may 'front' on a road. But in this case there does not appear to have been any existing road. The language of the grant, 'road to be allowed upon the bank,' indicates rather the reservation of a public right of way for a road then contemplated, than for one then existing. But in whatever condition the road was, it is clear that it was not referred to as a boundary. The Mills lot evidently 'fronted' on something, and we think that something was Fore River. It follows, therefore, by the usual rules of construction that Deborah Mills, by the grant of this lot of upland fronting on tide-water, became also the owner of the adjacent flats to low water mark, not exceeding one

hundred rods from high water mark. And her record title has come to the plaintiff."

The description which was thus construed to mean fronting on tide water and carrying with it certain riparian rights, did not say as description in the instant case says, that the land fronted on the water, but merely said "Front thirty rod," and the court held that as there was no road for it to front on, and as land is not usually described as fronting on land, and as the Mills lot evidently fronted on something, found that that something was Fore River. There is no necessity for me to resort to such fine reasoning to reach the conclusion that the lot in controversy fronted on the Bay, for the deed states so specifically, and the Mills case cited *supra* abundantly supports my position that the words "fronting on the Bay" carry with them the right to the lowlands lying between the upland and the waters of the Bay, and the riparian rights thereto attaching.

A very strong and well reasoned case, copiously supported by authorities, on the question involved in the one under consideration, is that of Morgan v. Livingston, 6 Martin, O. S. (La.) 19. It is instructive in that it gives the Spanish and French terms used in descriptions in deeds and their translations, and their force and purport when expressed in English. The original deed upon which Thiesen's title is predicated was in Spanish, and was executed while Florida was a Spanish possession, and the words used in the description should be given the meaning which was intended by them. If the Spaniards used the expression "Frente al Bayou" to designate a lot bounded by the Bay, we should not defeat that purpose and say they meant aspect and not boundary, because they did not use our more labored

and tautological one of "bounded by and extending to
the waters of the Bay." I quote freely from the opinion
in the case of Morgan v. Livingston, *supra,* not as an
authority for the conclusion which I have reached, but in
support of it. In that case J. B. Poeyfarre sold to P.
Bailly property thus described: "A lot of mine situated
out of this city, consisting of 60 feet of front and 180
in depth, in conformity with the plan of Don Carlos
Trudeau, public surveyor of the city, bounded on one
side by a lot of the vendor, and on the other by one of
B. Gravier, which lot belongs to me for having purchased
it with greater quantity of land from B. Gravier and
Maria J. Delhonde, his wife." In the deed to Poeyfarre,
the premises were described as "a piece of land forming
a trapszium, situated out of the Chapitoulas gate, con-
sisting of 415 feet of land, *frente al rio,* front to the
river, 186 feet in depth on the side of the city, 411 feet
8 inches on the side of the vendor's garden, and on the
back 229 feet 8 inches. The whole forms 2386 toises 4
feet and 6 inches of land in superficies, as appears by
the plan of Don Carlos Trudeau, public surveyor, of the
9th instant, which the parties have signed, and which
remains in the power of the vendee." In discussing the
case the court said: "From a very close examination
of the books of the land office of the United States,
which have been submitted to us, and the depositions of
surveyors, examined in this case, it is clear that in
French and Spanish conveyances, both public and private,
the words *face au fleuve, face, frente al rio, frente,* front
to the river, or front, exclusively designate estates
bounded by the river—which in the country are other-
wise called riparious, bound to the repair of the road,
its ditches, bridges and levees, and to supply ground for

either or the whole of these, when that which they cover is carried away by the water. We are therefore bound to take the expression, *frente al rio,* in the deed, as evidence of the intention of one of the parties to convey, and of the other to acquire, a riparious estate; unless, by taking it in this sense, we are led to an incongruous or absurd result. * * * "If the parties to the deed to Poeyfarre meant that a riparious estate should pass, their intention might be carried into effect by conveying as far as the river by express words, or by conveying everything susceptible of absolute private ownership between the line of the trapezium most distant from its front and parallel to the river, till the bank. In the present case both methods appear to have been adopted. The land is sold, front to the river; an expression, which in the general understanding of the county, is equivalent to the most explicit terms of a boundary on the river; and it does not appear that the vendors, who by the pleadings are admitted by both parties (since they both claim under them) to have been riparious owners, have retained any part of the ground between the trapezium and the river." * * * "The impression on our minds is irresistible, that Poeyfarre sold to Bailly, as he had himself purchased from Gravier, a riparious estate; one bounded by the river, or separated only by the public road." * * * "We conclude that, on the inspection of the deed, it appears to us the words *front to the river,* used therein, were intended to denote a riparious estate bordering on the river."

In none of the cases which I have cited have the descriptive words been as strong and clear as in the instant case. One uses the term "front thirty rod," another "front to the river," but in both cases it was held that these words conveyed a riparious estate. Had

the description in the deed from Vitrian said "fronting the river" there might have been grounds for discussion and for giving a strained instead of the natural and obvious meaning to the words, but the use of the word "on" in connection with "fronting," removes all doubts and carries with it the idea of physical contact.

So far I have discussed only the proposition advanced by the majority of the court, that *"Taken alone* the words 'fronting on the Bay' certainly cannot be held to be sufficient to show that the land was 'actually bounded by, and extended to, the waters of the navigable Bay.'" But, as I said in the opening part of this opinion, this description need not, and should not, be "taken alone," but must be taken in connection with the evidence in the case. The Superior Court of the Territory of Florida considered that the lot extended to the Bay, because in the U. S. Marshal's deed to Francis Bobe dated August 31st, 1841, it is described as "the Eastern half of said lots, numbered three hundred and sixty-eight, and three hundred and sixty-nine, situated in the City of Pensacola, and containing forty-seven and a half feet front on Zarragosa Street, and extending back two hundred and sixty-one feet and three inches to the Bay of Pensacola, and fronting thereon forty feet."

In 1875 Francis W. Bobe sold the lot to Elias Lee, and in 1878, Elias and Mary Lee reconveyed it to Bobe, and in both deeds the land was described as "extending back two hundred and sixty-one feet and three inches to the Bay of Pensacola and fronting thereon  *   *   *  be the said fronts and depths more or less." Beginning with the deed from Bobe to Lee, we find in all the descriptions to this lot the words "be the front and depth more or less," a clear recognition that since the earlier deeds there had been an accretion to this lot. The adminis-

trator of the estate of Francis Bobe in 1880, in his report to the County Judge described the lot as being "back on the Bay of Pensacola." In the same year the commissioner appointed by the County Judge to sell the real estate belonging to the heirs of Francis Bobe, reported that he had sold the "E 1-2 of Lots 368 and 369 Block 1, containing 40 feet front on Zarragossa Street, and extending back 267 3-12 feet to the Bay of Pensacola, and fronting thereon 47 6-12 feet, be the front and depth more or less." It is a circumstance to be considered, that in this report the lot is described as extending back 267 3-12 feet, instead of 261 3-12 as theretofore. It is reasonable to assume that the lot had by this time gained six feet by accretion, and this explains the excess of land found by Thiesen when he measured it before the filling in was done by the G. F. & A. Ry. It is true that it does not account for all the excess but the extensive fills made to the water fronts of Pensacola between 1880 and 1914 naturally resulted in the recission of the water line and the consequent extension of the line of all lots along the water front.

The Commissioners in making a deed to Walters returned to the paper dimensions of the lot, but used the significant words "be the front and depth more or less."

In 1892, Walters, a predecessor in title of Thiesen, leased "a right of way 15 feet in width along and across the water front of the Bay of Pensacola, City of Pensacola, said State and County, now owned by * * * fronting 47 feet on the Bay of Pensacola to the edge of the channel of said bay * * * and the said party of the second part especially agrees not to interfere with the water front and the riparian rights of the party of the first part south of the said right of way to the edge of the channel of the Bay of Pensacola all of which riparian

rights are hereby reserved under the said party of the first part, his heirs and assigns, and the said party of the second part further agrees to keep the right of way hereby leased free and unobstructed so as to allow free and unobstructed access and passage over said right of way and from the wharf now built and owned by the party of the first part."

The deed from Walters to Thiesen changed the phraseology of the description a bit, but did not alter its i1 port. It reads: "running through to Pensacola Bay, being two hundred and sixty-one 1-4 feet, and having a frontage on said bay of forty-seven and a half feet." In all the descriptions in the various documents from Vitrian's deed to Walters, I find an effort to convey a lot fronting on the Bay,—and I use the term "fronting on the Bay," advisedly, as I am satisfied that theoretically, philologically and legally it describes a lot "actually bounded by and extending to the Bay," in the absence of anything to show a contrary intent.

I take it, that the natural meaning of the words "fronting on the Bay," and "fronting on the street," mean boundary and not aspect and consequently whoever contends for the unusual constructions, assumes the burden of proof, and until he meets the requirement, the natural, obvious, common sense, everyday meaning of the words should be accepted.

I pass now to another phase of the case. Assuming there was doubt about the boundaries of this lot, it was a question of fact to have been decided by the jury. It is a settled rule in this State that "When there is room for a differnce of opinion between reasonable men as to the proof of facts from which an ultimate fact is sought to be established, or when there is room for such differences as to the inferences which might be drawn from conceded

facts, the court should submit the case to the jury for their finding." Anderson v. Southern Cotton Oil Co., decided in the January Term of this court, and cases cited therein.

The testimony of old and reliable citizens like Mr. Albert Riera and others who testify for the plaintiff as to the ancient boundary of the lot, was as specific as possible on the question of, whether the land owned by the predecesssor in title to the plaintiff, was originally bound by and extended to the waters of the navigable bay. The extensive fills which have been made for miles along the water front of Pensacola in the last thirty or forty years have caused the shore line of the unfilled lots to recede, so that a lot which an hundred years ago extended one hundred and thirty-one feet to the waters of the bay, may now extend much farther by reason of such recissions.

"The rule governing additions made to land, bounded by a river, lake, or sea, has been much discussed and variously settled by usage and by positive law. Almost all jurists and legislators, however, both ancient and modern, have agreed that the owner of the land, thus bounded, is entitled to these additions. By some, the rule has been vindicated on the principle of natural justice, that he who sustains the burden of losses and of repairs, imposed by the contiguity of waters, ought to receive whatever benefits they may bring by accretion; by others, it is derived from the principle of public policy, that it is the interest of the community that all land should have an owner, and most convenient, that insensible additions to the shore should follow the title to the shore itself." Banks v. Ogden, 2 Wall. (U.S.) 57, text 67.

Charles P. Bobe testified: "I do not think the lot went quite to the water after the wharf was built. Walters

had a wharf. He utilized this wharf for fishing. He had boats along the wharf all the time."

William Cline testified that 38 years ago there was a wharf and bath houses on the property and that he had seen boats landed there. "The lot went out in the water, fishermen brought the boats there and loaded them there when they were going to sea." He had seen fish boats land there more than thirty years ago. "The wharf was knocked down several times by storms and floating timber, but was built back again." Describing the south end of the lot he said "The sand that Mr. Bobe put there seeped out and was washed out with every blow and made land. Where there was water before there was land afterwards. It was made land. Boats were pulled right up on the lot from the bay before the road was built there."

Frank Caro has known the lot since 1882. "The fence ran down to the water, the fence on the western side and the eastern side. The wharfs were maintained there and somtimes the storm would wash the wharf down and he would replace it. Several times. Boats landed there. At high tide the water would go right up in front of the place, pretty near in the yard. In low tide you could walk out. There was a fence running east and west but there was a lot run down to the bay. There was no fence to the south side of it at all. It was open to the bay."

Mr. Albert Riera is 73 years old, has lived in Pensacola all his life except while in the Confederate Army. He testified: "I knew that lot before the war. The lot on the west side of my father's was always known as the 'Bobe lot.' The lot on the west side of that was the Hernandez lot. There was a fence between my father's and Bobe's lot. I do not think the back portion of that Bobe

lot was ever fenced.    There was nothing between that lot
and the water.    It was just an open beach open to the
bay.    It was quite a short distance from the front por-
tion of that lot to the beach.    It depended upon the tides.
There was sufficient room for a vehicle to pass by, where
the waters would cover it at high water.    By lot I mean
the high land."    It is clear that these witnesses in
speaking of the "lot" or the "yard" had reference to the
usable part of the lot, or the upland.    Mr. Caro says
"The place south of the house towards the bay is what I
call the yard."    These explanations by Albert Reira and
Frank Caro as to what they mean by "lot" and "yard"
show the significance of the testimony of the other wit-
nesses, and,from all the testimony it seems very clearly
established to my mind, that this lot fronted on, was
bounded by and extended to the waters of the bay.

The doctrine of the Anderson case, cited *supra*, is thus
stated in the fourth headnote:    "A party in moving for
a directed verdict, admits not only the facts stated in the
evidence adduced, but also admits every conclusion favor-
able to the adverse party that a jury might fairly and
reasonably infer from the evidence."

There is no denial that the plaintiff and his predecessor
in title had been in actual possession of this lot for up-
wards of fifty years, living on the dry part of it, and
using the water front for the benefit of such commerce as
existed at that time and in that locality, and built such
wharves as such commerce required.    It is true the
wharves built by Bobe and Walters and Thiesen were not
as large as those built by the railroad which seeks to take
from the owner his riparian rights without just compensa-
tion, nor was the commerce of that day and locality as
great as that now handled by the railroad, but I fail to
find in the Act of 1856 a distinction based upon the size

of the wharves or the volume of commerce.    If they were adequate to the time and place, and the needs of those to be benefitted, "It is enough, it will serve."

The cases of Alden v. Pinney, 12 Fla. 348, and Sullivan v. Moreno, 19 Fla. 200, hinged, as in this case, on the question of fact whether the lot in controversy had a water boundary.    I quote from the opinion of Judge Westcott in the Alden v. Pinney case: "This leads us to the consideration of the case upon the proofs ,and the first question to be determined is:    Has the complainant established that the 'southern boundary of the lot' conveyed to Gonzalez on the 19th February, 1827, from whom he derives title, 'was the bay,' or that it extended to the line of ordinary high tides in calm weather at that time? What may be the effect of the reservation of Lot E for a market house and store house, as designated on the plan of the Cabildo, we do not determine, as no point is made of it by defendants, and we treat the case as though an absolute and proprietary right is in the complainant to whatever passed under the deed.    The question of boundary here is a fact to be determined by a consideration of the whole evidence."    (Text p. 381.)

In discussing whether certain calls in the deed indicated aspect or boundary Judge Westcott said: "These terms, therefore, must receive that construction and signification which is most consistent with the other calls and the evidence in the case."    (Text p. 382.)

In the case of Sullivan v. Moreno a public way, street, or common, lay between the Moreno land and the bay, and the lot was described as bounded "on the south by a street of the Pensacola Bay," and the question of Moreno's riparian ownership was decided on the ground that his deed described his south boundary as "a street on the Pensacola bay."    In neither of these cases was the

4—Vol. 75

description like that in the deed under which Thiesen claims, nor was there such evidence of long continued possession and acts indicating a claim of ownership to the lowlands, as in this case.

Because of the "differences of opinion" between the members of this court, "as to the inferences which might be drawn from conceded facts," I think I am justified in saying that "there is room for a difference of opinion between reasonable men," and the case comes well within the rule of Anderson v. Southern Cotton Oil Co., cited *supra,* and that the court erred in directing a verdict for the defendant.

Chapter 4802 Laws of Florida, Acts of 1899, which sought to dispose of certain parts of the water front of the City of Pensacola is ineffective to deprive a person of riparian rights, if such existed prior to the passage of the act. The part which it is claimed affects the parties to this suit, is that which provides in effect that if any person claiming riparian rights under the act of 1856, failed to make application for the same within two years before certain commissioners named in the act, the commissioners should make a deed to the City of Pensacola for all such lots or portion of such lots for which no application was filed. It is contended by defendant in error that because the owner of the land in controversy did not make applicaiton for a deed to the lowlands in front of his lot, the same became forfeited and title thereto passed, to the City of Pensacola.

The act of 1856 imposed the conditions under which a riparian owner could acquire the right to the use of lands covered by water adjacent to his property; and divested itself of "all rights, title and interest to all lands covered by water lying in front of any tract of land owned by any citizen of the United States * * * lying upon any

navigable stream or bay of the sea or harbor as far as to the edge of the channel," and vests "the full title of the same in and to the riparian proprietor."

This title is not contingent or dependent upon the erection of wharves or the filling in of the shore, bank or beach.

The State having divested itself of all rights, title and interest in such lands, and granted the same to the riparian proprietors, had no power thereafter to impose new and additional burdens or obligations upon such riparian proprietors. The title to the lands covered by water which the riparian owner derived from the grant of 1856, is as absolute as a title derived from any other source, and the Legislature was without power to impose conditions upon him by which he would be divested of his title upon non-compliance of the same.

Assuming however that the Legislature had the power sought to be exercised by the act of 1899, the method pursued was clearly unconstitutional, in that it undertook to create a Judicial tribunal not authorized by the constitution, and in contravention thereof. Notwithstanding the act of 1899 designated the parties who were to carry into effect the provisions of the act, "commissioners," the powers conferred upon them were judicial. They were to receive, file and record claims to real estate and rights appurtenant thereto; they were given power to summon and swear witnesses, to hear testimony and receive evidence, and finally to determine the rights of persons to whom grants were made and such determination was conclusive as to such rights. That it was intended for these acts to be judicial is apparent from Section 7, which refers to the finding of the commissioners as an "adjudication."

I think the court erred in refusing to permit the plain-

tiff to introduce in evidence that part of the Report of the United States Commissioners on page 119 Vol. 4 of American State Papers, (Duff Green edition).

In 1826 Congress enacted "That all of the decisions made by the Commissioners, appointed to ascertain claims and titles to lands in the District of West Florida, made in favor of claimants to lands and lots in said District, contained in the Reports, opinions, and Abstracts of the Commissioners, which have been submitted to the Secretary of the Interior, according to law, be and the same are hereby confirmed."

The parts of the report offered in evidence, objections to which were sustained by the court are as follows, "The lots in Pensacola do not belong to the King but to individuals and their dimensions carry them to the *waters edge at high tide.*" "The line in front was one of admeasurement, and not entirely a line of boundary and the lot was sold *per aversionem,* and not *ad mensuram;* that is, it was disposed of in the gross, and not by the measure, or so much the acre."

The Supreme Court of the United States has decided that The American State Papers, published under revision of the United States Senate, contained authentic papers which are admissible as evidence without further proof. Bryan v. Forsyth, 19 How. 334; Gregg v. Forsyth, 24 How. 179.

I am very strongly convinced that the judgment in this case should be reversed, not only on account of the error in directing a verdict for the defendants, but on account of the other errors which I have discussed.

## ON PETITION FOR REHEARING.

ELLIS, J.—The plaintiff in error filed a petition for

rehearing in this case upon several grounds, in one of which, namely, the fifth, he contends that his action in the court below was based not only upon the riparian act of 1856, but upon his common law right of riparian owner.

This contention was not distinctly made either in the briefs or the oral argument. The case was argued upon the theory that the cause of action rested upon and the evidence established the ownership by the plaintiff of the submerged lands between high and low water mark in front of the lot which fronted on the bay. The case was decided with reference to that single contention. The court saying, in effect that to acquire any rights under the riparian act of 1856, Laws of Florida, the owner of the land fronting on the bay should own the land to low water mark, and as there was no evidence whatever in the record that the plaintiff in error nor his predecessor in title owned the land to low water mark, he acquired no rights under the act of 1856.

The effect of this decision was to hold that title to the foreshore, that is to land between high and low water mark on bays, harbors or navigable streams cannot be acquired by prescription. The title being in the State for the benefit of the public the statute of limitations does not run.

It is however now insisted in the petition for rehearing that the owner of the lot mentioned in the pleadings claimed a common law right as riparian owner. That is to say the right of ingress and egress over the waters of the bay to and from his lot and the right to bathe and fish in those waters, and as that right depends merely upon the fronting of the lot on the bay, that is to say, the extension of the lot to high water mark there was evi-

dence sufficient, as shown by the record, to be submitted to the jury on that issue.

With this proposition the court finds no fault, as it is of the opinion now, and was when the case was considered, that "there is room for difference of opinion between reasonable men" as to whether the boundaries of Lot No. 369 extended to the high water mark of the bay.

We have therefore examined the pleadings as thoroughly as the condition of the record and manner of its makeup permits with the view of ascertaining whether there was any issue resting upon common law rights of riparian ownership.

There are six counts to the declaration. The first two, filed in October, 1914; the third and fourth counts filed in June, 1915; the fifth count on February 7th, 1916, and the sixth count February 18th, 1916. The third and fourth counts went out upon demurrer, and the order was made the basis of the second assignment of error. These two counts were distinctly intended to be framed upon the rights alleged to have accrued to plaintiff's predecessor in title under the act of 1856. The fifth count distinctly asserts ownership in the plaintiff of the submerged lands in front of lot 369 on the bay side, while the sixth count seems to be an effort to allege by way of inference and innuendo the plaintiff's right, under the act of 1856. It alleges that when the plaintiff acquired the lot he was a citizen of the United States, a condition precedent to the taking effect of the grant; that he exercised the right to construct wharves and other water front rights on the submerged lands, and that he had constructed wharves and docks on the south side of the lot. The plea to this count seem not to have been replied to so that the case apparently went to trial

with no issue upon those pleas. Issue was joined upon the pleas to the fifth count which expressly denied ownership of the submerged ground by plaintiff, water boundary, ownership of the lot and twenty years proprietorship of riparian rights.

The second count of the declaration seems to be framed upon the theory that the plaintiff through his predecessors in title had acquired a title by prescription to the submerged land whereby he had the right to build wharves and bathhouses in the waters on the bay side of his lot, and such right had been interfered with by the defendant.

The first count of the declaration by treating certain portions of it as surplusage may be regarded as a declaration upon the common law right of a riparian owner. The first plea to both counts, the plea of not guilty, and the first "further plea" to the first count, seem to have been framed in the view that they would be applicable in case the first count was construed as a declaration on the common law right of a riparian owner.

It is our conviction from the pleadings in this case that the plaintiff's case was begun and tried upon the theory that he or his predecessors in title acquired rights under the act of 1856 or by prescription, and that the idea of insisting on the common law rights which the plaintiff had if his land did actually extend to the waters of the bay occurred at a later time. We did however overlook the fact that the first count of the declaration could by eliminating a large part of it as surplusage, be treated as a declaration upon the common law right of riparian ownership and interference therewith by the defendant, and while the history of the case as disclosed by the record shows that such was not regarded as the basis of the complaint, yet in deference

to the assertion of counsel to the contrary in their petition for a rehearing, we have decided to grant the petition.

A rehearing is ordered.

BROWNE, C. J., AND TAYLOR, WHITFIELD AND WEST, J. J., concur.

## ON REHEARING.

ELLIS, J.—The plaintiff in error brought suit in the Court of Record of Escambia County against the Gulf, Florida & Alabama Railway Company and the Eastern Construction Company for damages which the plaintiff claimed he had sustained because the defendants had, by filling in the submerged land in front of plaintiff's lot which he alleged extended to the waters of Pensacola Bay, deprived him of his rights as a riparian owner.

The case came on for trial upon the issues joined, and after hearing the evidence and argument of counsel the court instructed the jury to find for the defendants. Final judgment was entered upon the verdict and the plaintiff took a writ of error.

In an opinion filed November 3rd, 1917, this court affirmed the judgment upon the theory that the plaintiff having based his action upon the act of 1856 entitled "An Act to benefit commerce," commonly known in this State as the "Riparian Act," and having failed to prove that the lot in question was actually bounded by and extended to low water mark of the bay which was essential to sustain his claim for damages the affirmative charge given by the judge in defendant's favor was correct.

The court granted a rehearing upon the petition of plaintiff in error upon the ground that as the plaintiff contended that his action was based not only upon the statute above mentioned and quoted in full in the first opinion, but also upon his common law right as a riparian owner, and the court not having considered the case from that viewpoint, the plaintiff was entitled to be heard upon that feature of the case.

At common law lands which were bounded by and extended to the high water mark of waters in which the tide ebbed and flowed were riparian or littoral to such waters. See Broward v. Mabry, 58 Fla. 398, 50 South. Rep. 826; Pollard's Lessees v. Hagan, 3 How. (U. S.) 212, text 219; Sullivan v. Moreno, 19 Fla. 200; State ex rel. Ellis v. Gerbing, 56 Fla. 603, 47 South. Rep. 353; Ferry Pass Inspectors' & Shippers' Ass'n v. Whites River Inspectors' & Shippers' Ass'n, 57 Fla. 399, 48 South. Rep. 643; Gould on Waters, Sec. 148; Lyon v. Fishmongers' Co., L. R. 1 App. Cas. 662. And applying the common law doctrine to the subject in this State the title to the soil under such waters to the high water mark is in the State of Florida subject to the powers of Congress to regulate commerce. See Sullivan v. Moreno, supra; Broward v. Mabry, supra. The title however is held in trust for the people who have the rights of navigating, fishing, bathing and commerce upon and in the waters.

The first count of the declaration alleges that the plaintiff is the owner in fee simple and has the possession of the East half of Lot 369 of Block One of the Old City of Pensacola and for more than twenty years prior to the acts complained of the lot had a southern boundary upon the waters of Pensacola Bay, and during

that period the plaintiff and his predecessors in title had access from the channel of the bay and its navigable waters to said lot by means of the water on the south boundary and for that period of time they have exercised the rights of ingress and egress to and from the said lot on the water or south side by boat and rafts; and during said period they have "exercised the right to construct and maintain wharves and bath houses and other waterfront rights, on the south or shore side of said lots between the said lot and the channel of Pensacola Bay." It is alleged that the defendants in 1913 interfered with these rights of the plaintiff by filling in with earth from the shore line of the lot to a long distance southward toward the channel of the bay and constructed "tracks" thereon and "appropriated said space" so that the plaintiff has been deprived of his rights of "ingress and egress from the navigable waters of Pensacola bay to his said lot by boat or vessel," and been deprived of the right to "construct wharves, piers, docks and other water front privileges," by reason of which he has been greatly damaged, and hence brings this action.

This count of the declaration rests upon a right which the plaintiff alleges he has as owner of Lot 369 to have ingress and egress to and from his lot over the waters of the bay and to construct and maintain wharves, piers, docks and bathhouses on the south or shore side of the lot between the lot and the channel of the bay.

In so far as the declaration alleges the right of ingress and egress to and from the lot over the waters of the bay, it states a common law right appertaining to riparian proprietorship. The common law riparian proprietor enjoys this right and that of unobstructed view over the waters and in common with the public the right

of navigating, bathing and fishing, but whether as riparian owner he also has the right to build and maintain wharves, piers, docks and bathhouses between his shore line, that is to say from high water mark, upon the submerged soil which belongs to the State, out to the channel of the bay is a question which will have to be determined in view of the fact that upon this alleged right existing in the riparian owner will depend largely the measure of damages to which the plaintiff may be entitled if he should recover for the alleged violation of his common law right. Eliminating that portion of the count which alleges a right to construct and maintain wharves, docks, piers, etc., to the channel as surplusage there remains in the count allegations sufficient to sustain an action upon the violation of the common law rights of ingress and egress to and from the lot over the waters of the bay. The defendants did not demur to this count, nor did they make a motion to strike any part of it, nor for compulsory amendment, nor did they make any effort to eliminate from the case as made by this count the right conferred by the statute, but pleaded to it the general issue and several special pleas.

The count does not allege that the boundary of plaintiff's lot extended to low water mark, but it does allege rights to exist in the plaintiff which are conferred by the statute of 1856, sections 643 and 644 of the General Statutes, 1906, if at the time of the passage of the act the owner of the lot was a citizen of the United States and the boundaries of the lot extended to low water mark. If the count should be tested and made to stand or fall by the allegations as to plaintiff's right to build wharves, docks, piers, etc., rights which as stated are secured by the act of 1856, we should be constrained

to hold that the count rested on the act of 1856, and reaffirm our first opinion if the rights secured by the act did not also exist at common law.

As a count based solely upon the statute it may have been subject to demurrer for lack of certain material allegations, but as it appears from the pleadings and was stated in the ·oral argument by counsel that the parties treated the count as a declaration upon the common law right, we will so treat it here, and consider whether the allegations as to plaintiff's right to construct and maintain wharves, piers, etc., to the channel should be eliminated as surplusage.

Counsel for plaintiff in error in their last brief say that the right to "construct wharves, piers and docks and exercise other waterfront privileges are rights that belong to riparian owners under the common law," and "the books are full of cases showing the common law rights and how they have been exercised both in England and this country." In view of the fact that the declaration is based upon the plaintiff's asserted right to "construct and maintain wharves and bathhouses and other water front rights" between the "lot and the channel of the bay," we regret that counsel deemed it unnecessary to cite a single case or text-book supporting the plaintiff's declaration if it is construed to be based upon the right in the plaintiff to construct docks, piers and other buildings from the shore beyond low. water mark out to the channel. We have made a diligent search of the books for such a doctrine but have been unable to find a single authority. in support of it.

· It is perfectly clear that the legislature of 1856 did not consider the doctrine as announced by plaintiff's counsel to be so well settled, otherwise Chapter 791 may

have been confined to granting the privilege of filling "up from the shore" and that right may not have been limited to such owners of lots whose boundaries extended to low water mark. The act of 1856 granted to such riparian owners whose lots extended to low water mark the right to "build wharves into streams or waters of the bay or harbor as far as may be necessary" for facilitating the landing of goods. "And to fill up from the shore, bank or beach as far as may be desired not obstructing the channel," and upon the lands so filled in to "erect warehouses or other buildings."

If the owners of lots which extended only to high water mark had the right at common law to construct wharves, docks and piers out into the bay to the channel, to "wharf out" as the saying is, the act of 1856 was superfluous. In fact it rather hinders than facilitates the purpose of its enactment by confining the privileges granted to the owners of such lots as were bounded by and extended to low water mark.

The right did not exist at common law. In Hale's Treatise DeJure Maris, Hargrave, it is stated that the ground between ordinary high water mark and low water mark is owned by the sovereign but not for his exclusive use and profit, but in trust for the common benefit of all his subjects. Any intrusion by the owner of the upland upon the shore between high and low water mark was unlawful and was treated either as a purpresture or a nuisance. See Angell on Tide Waters, Chap. VII; Moore's History of the Foreshore, 370; 3 American Jurist, 185-190; Respublica v. Caldwell, 1 Dallas Rep. 150. In the case of Dutton v. Strong, 1 Black (U. S.) 22, the Supreme Court of the United States speaking through Mr. Justice Clifford, said: "Where piers and landing places and wharves are constructed by the riparian pro-

prietor on the shores of bays and arms of the sea as well as on lakes, and where they conform to the regulations of the State and *do not extend below low water* mark, it has never been held that they were nuisances   unless   it appeared that they were an obstruction to the paramount right of navigation."   In this connection the judge said "our ancestors, when they immigrated here, undoubtedly brought the common law with   them,   as   part   of their inheritance; but they soon found it indispensable, in order to secure these conveniences, to sanction the appropriation of the soil between high and low water mark to the accomplishment of these objects. Different states adopted different regulations upon the subject, and in some the right of the riparian proprietor rests upon immemorial local usage."

Mr. Angell in his work on Tide Waters recognizes the doctrine of the common law that the right of property in tide waters and in the soil thereof is in this country in the State, and the State may abate every intrusion thereon whether the same be a nuisance to the navigation or not. Angell on Tide Waters, Chap. VII.   At the same time says he, "it is well known that in the respective States which lie along the margin   of the Atlantic   there are many places where the tide ebbs and flows," and which therefore are public, "that are of no navigable use and in their original condition without the aid of art and industry afford to the public   little   or no   advantage of any kind."   Flats and marshes covered with water   only   at full tide.   In many cases such waste   places have been built up, docks or piers run over them to navigable water by the riparian proprietor and the public have been thereby very considerably the gainers.   But that condition in no wise affects the common law, but is one which commends itself to the legislatures of the respective states for

the adoption of such regulations as may be deemed to be for the best interests of the people.

The case of Railroad Company v. Schurmeir, 7 Wall. (U. S.) 272, the Supreme Court of the United States again through Mr. Justice Clifford said that riparian proprietors on navigable streams have the right to construct suitable landings and wharves for the convenience of commerce, and cited Dutton v. Strong, *supra,* in support of the doctrine. In Yates v. Milwaukee, 10 Wall. (U. S.) 497, Mr. Justice Miller speaking for the court said: "But whether the title of the owner of such a lot extends beyond the dry land or not, he is certainly entitled to the rights of a riparian proprietor whose land is bounded by a navigable stream; and among those rights are access to the navigable part of the river from the front of his lot, the right to make a landing, wharf or pier for his own use or for the use of the public, subject to such general rules and regulations as the legislature may see proper to impose for the protection of the rights of the public whatever those may be." But that case does not recognize the right of the riparian owner to build wharves beyond the low water mark to the channel.

In the case of St. Anthony Falls Water-Power Co. v. St. Paul Water Commissioners, 168 U. S. 349, 18 Sup. Ct. Rep. 157, the court was of the opinion that the property rights of a riparian owner of land on navigable waters are to be measured by the rules and decisions of the State within whose boundaries the particular land lies. In Barney v. Keokuk, 94 U. S. 324, it was recognized as the law that the title and rights of riparian proprietors upon the banks of the Mississippi were to be settled by the states within which the lands were included. That case was cited in St. Anthony Falls Water-Power Co. v. St. Paul Water Commissioners, *supra,* in support of the doc-

trine announced in the latter case.    The case of Packer v. Bird, 137 U. S. 661, 11 Sup. Ct. Rep. 210, asserted the right of each state to determine the extent of the title and of the rights of the riparian owners in waters within the territory of the state.    See also Hardin v. Jordan, 140 U. S. 371, 11 Sup. Ct. Rep. 808, 838; Shively v. Bowlby, 152 U. S. 1, text 45, 14 Sup. Ct. Rep. 548; Lowndes v. Town of Huntington, 153 U. S. 1, text 19, 14 Sup. Ct. Rep. 758, 243 U. S. 316, 319.

This court has several times indicated the extent of the rights of a riparian owner upon navigable streams.    In Ferry Pass Inspectors' and Shippers' Association v. Whites River Inspectors' and Shippers' Association, *supra*, the court speaking through Mr. Justice Whitfield, said: "Riparian rights are incident to the ownership of lands contiguous to and bordering on navigable waters. The common law rights of riparian owners with reference to the navigable waters are incident to the ownership of the uplands that extend to high water mark."    "Among the common law rights of those who own land bordering on navigable waters apart from  rights  of alluvion and reliction are the right of access to the water from the land for navigation and other purposes expressed or implied by law the right to a reasonable use of the water for domestic purposes," etc., enumerating other uses incident to the waters of a navigable stream.    Continuing the court said: "Subject  to the superior  rights  of the public as to navigation and commerce and to the concurrent rights of the public as to fishing and bathing and the like, a riparian owner may  erect upon  the bed and shores adjacent  to his riparian  holdings,  bath houses, wharves or other structures to facilitate his business or pleasure; but these privileges are subject to the rights of the public to be enforced by proper public authority or by

individuals who are specially and unlawfully injured."

In Merrill-Stevens Co. v. Durkee, 62 Fla. 549, 57 South. Rep. 428, the court said: "The owner of land abutting on navigable waters had no exclusive right in the waters below ordinary high water mark or in the lands under the waters except the right of access to and from the navigable waters and rights in the land growing out of accretion or reliction."

In this State because of its great coast line and many navigable rivers and lakes and the number of bays and harbors and lowlands, there are many places where the tide ebbs and flows, or which are covered by ordinary high water that are of no navigable use, but which according to the common law belong to the public, and because of this condition the owners of riparian lands in many instances have exercised the privilege of constructing wharves or piers to the navigable waters.    Such structures however are none the less purprestures in law or nuisances if they amount to a damage to the port or navigation and cannot be considered as a right appurtentant to the upland.    The right to build wharves into the streams or waters of the bay or harbor and to fill up from the shore and to build upon the lands so filled in, was granted by the act of 1856, but the grant was limited to those whose lands were actually bounded by and extended to low water mark.    Sections 643 and 644 General Statutes, 1906.    We think therefore that so much of the first count of the declaration that alleges a right in the plaintiff to construct and maintain wharves and bathhouses and other waterfront rights on the south or shore side of the lot between it and the channel of the bay, should be eliminated as surplusage.

The question of title is the next point involved.    The declaration alleges in the first count that the plaintiff

prior to and at the institution of the suit was and is the owner in fee simple of the east half of Lot 369, Block One of the Old City of Pensacola, and that during a period of more than twenty years the plaintiff and his predecessors in title to the said lot have had access from the channel of the bay by means of the water on the south boundary or shore. The pleas deny the plaintiff's title and deny twenty years possession.

It is contended by defendant that there is no evidence that the title to the lot in question ever passed out of the Spanish Government, hence it was acquired by the United States Government upon the cession of Florida to the United States, and that there is no evidence that the title has ever passed out of the United States Government.

If the title to the lot in question passed to the United States Government when Florida was acquired from Spain by the Treaty of 1819, which was the case if the Government of Spain had not before that time conveyed its title to some person, then the plea of defendant denying title in the plaintiff was sustained and there was no error in the peremptory charge for the defendant. If however Spain had divested herself of title by sale or grant prior to the acquisition of the territory of the United States and such sale or grant was confirmed by the Commissioners of Lands Claims in West Florida, or by Act of Congress or by judgment of a court, then the plea was not sustained so far as this point was involved.

The plaintiff offered in evidence a copy of the record of a deed from Lorenzo Vitrian, Sindick to Antonio Montero dated December 31, 1813, conveying Lot No. 369 in Pensacola. The dimensions of the lot are given as ninety-five feet front by one hundred and thirty-one feet three inches in depth "fronting on the bay." Also a

copy of the record of a deed from Antonio Montero to
Francis de Barrios conveying the same lot and dated
February 18, 1814. This deed recites that Antonio Mon-
tero purchased the lot at a "public sale ordered by this
Ayuntamiento." The plaintiff then offered certain parts
of the American State Papers to show confirmation by
the American Government of the sale of the above men-
tioned lot. The record shows that the court declined
to admit these documents in evidence.

In 1822 Congress passed an act "for ascertaining
claims and titles to land within the territory of Florida."
Under this act Commisisoners were appointed for the
purpose of ascertaining the claim and titles to lands
within the territory of Florida as acquired by the treaty
of 1819. These Commisisoners were a board of inquiry,
said Mr. Chief Justice MARSHALL, and not a court exer-
cising judicial power and deciding finally on titles. The
Commissioners were to examine into and report to Con-
gress such claims as ought to be confirmed. The pur-
pose of the act under which the Commissioners were
appointed was to ascertain the claims and their location,
preliminary to the sale by the government of public
lands. "The refusal of the Commissioners to report a
claim for confirmation was not considered as a final
-dicial decision on the claim binding the title of the
party, but as a rejection for the purpose of the act."
See United States v. Percheman, 7 Peters (U. S.) 51, 8
L. Ed. 604.

Section 1 of the Act of Congress entitled "An Act to
confirm the reports of the Commissioners for ascertain-
ing claims and titles to lands in West Florida and for
other purposes" approved April 22, 1826, confirms all the
"decisions made by the Commissioners" in favor of
claimants to lands and lots in the district "contained

in the reports, opinions and abstracts of the Commissioners which have been transmitted to the Secretary of the Treasury."

The American State Papers, Volume 4, is a publication made under the authority of the Senate of the United States and contains documents, legislative and executive, of the Congress of the United States in relation to public lands. This volume contains the reports of the Commisisoners appointed under the act approved in 1822, entitled "An Act for ascertaining claims and titles to land within the territory of Florida." These documents are received in evidence without other proof of their authenticity than the published volume. See Sullivan v. Richardson, 33 Fla. 1, 14 South. Rep. 692.

An examination of the reports of the Co'rmissioners shows a list of lots sold in Pensacola at public judicial sale by order of the "Superiority" of the town in December, 1813, and January, 1814. Lot No. 369 was adjudged to Don Antonio Montero according to this list. It seems from the reports that a question had arisen as to the authority of the town officials to sell the lots listed because they were laid off upon or contiguous to squares which under the British rule of the territory had been designated in the place of the town as public squares. British purchasers of lots fronting upon or contiguous to these squares had as the report shows acquired certain rights with which the replatting of the town interfered. When the Spaniards acquired the territory no alteration of the town plan was thought of for many years until the "mines of Mexico ceased to pour their floods of gold into the coffers of the provincial Government." Then in 1802 the first alteration was made. In 1806 Superintendent General Morales disapproved of the project and refused to confirm the titles given by Governor

Fotch y Juan, but decreed that the grantees should remain in possession "until the decision of his Majesty should be known." The report then states that it was not known whether the King approved the plan, but several years afterward Morales granted some of the lots. The report then states that in view of the long possession of the lots by the purchasers and the improvements made by them the "Commisisoners will do what the authorities of Spain could legitimately perform; and as the lots have been improved and occupied for that length of time with the consent of the officers of the Government, the original authorities and the continguous grantees although there might have been an original defect of power they will give confirmation to them." The sale of lots however under the "Constitutional Government" says the Commissioner is a different case and has none of the sanctions of the sales under the first change of the town plan. As to the acts of the "Cabildo" the powers of which "both under the Constitution and the King relate to the sale of lands only" and under a sale ordered by it the lots numbered in the list above mentioned were sold to the persons named in the list, there was doubt on the part of the Commissioners concerning their validity. The report states that the matter should have been "forwarded to the provincial deputation to be approved by the Cortes" but say the Commissioners "whether this was ever done or not or what was the result we have been unable to learn." As to the purchasers of these lots the report states that the Governor of West Florida had decreed that there was no authority by which the plan of the town could be altered so as even to interfere with the military buildings." The matter was referred to Congress for its decision, but the Commisisoners say: "this is admitted to be a hard case

upon most of the claimants. The original vendees it appears paid a valuable consideration for the lots and some of them have since passed into the hands of innocent purchasers. In equity and justice they are either entitled to the lots or the money with which they were purchased; but how they are to obtain redress Congress must determine." The Commissioners report contains the petitions of the purchasers of the lots to the Spanish authorities for an order confirming the sale of the lots. The petitions show the reasons operating upon the authorities of the town which induced them to enlarge the plan of the town and make sale of the lots, but they seem to relate to the lots which were carved out of the squares between Romana and new streets north of the Squares of Ferdinand and Seville, while lot No. 369 according to a map other than the one appearing in the American State Papers, is located in a different part of the town and fronts on the bay south of Zarragossa Street and four blocks west of Ferdinand Square in the southwestern part of the "old city." Lying immediately north of lot 369 and contiguous to it is lot No. 368 which was also included in the list of lots sold at public judicial sale by an order of the "Superiority" of the town and referred to above. Nowhere in the report of the Commissioners, the list of lots sold, abstracts of claims to lots confirmed and those rejected, nor in the above mentioned petitions of purchasers is any reference made to any lot of a larger number than 369 except in the one table on page 115 of Vol. 4 Am. St. Papers, under letter "F" which designates an abstract of claims founded upon sales at auction by the Spanish Government which were confirmed by the Commissioners. That entry is as follows: "No. 47" claimed by M. Hanna and widow McPherson. "Original vendee, Francisco Barrios, nature

of claim mesne conveyance," date of claim "Feby, 18-1814 Number 399" 80 by 170 feet and sold by "The' Cabildo." Under head of general marks in the last column it appears that the lot was sold at auction "Dec 31, 1817." This entry follows one numbered 46 in which it appears that lot No. 368 was claimed by the same persons, original vendee Antonio Colein, deed from the "Cabildo" Dec. 30, 1813. This lot No. 368 appears in the list first mentioned of lots "sold at public judicial sale by order of the Superiority of this town in the months of December 1813 and January 1814," as having been sold by the "Cabildo" to Don Antonio Collins. It is evidently the same lot referred to in Abstract "F" as having been originally claimed by "Antonio Colein as original vendee." Lot 369 as stated appears to have been sold by the Cabildo to Antonio Montera, but as shown by the deed from Montero to Francisco Barrios in evidence in this case was conveyed by the original purchaser under the Cabildo to Barrios on February 18, 1814. It also appears from the reports of the Commissioners that the sale of every lot in the list of lots sold by order of the "Superiority" of the town except lots numbered 360 and 369 were either expressly confirmed or rejected by the Commissioners or reported by them to Congress.

It is significant that neither in the abstract of claims to lots which were rejected by the Commissioners and listed under the letter "K" above referred to, nor in the abstract of claims to lots which the Commissioners reported to Congress, pursuant to their conclusion that certain claims should be referred to Congress for settlement and which they listed under the letter "L" does lot numbered 369 appear. It is apparent to us that the Commissioners did not regard lot No. 369 which was sold

by the Cabildo to Montero as being among those which for the reasons given by them should be either rejected or referred to Congress to specially confir.n or reject as being unlawfully sold by the Spanish authorities. The Commissioners undoubtedly intended to report upon all the claims submitted to them. A claim to lot 369 among others, sold by the Cabildo was submitted. Some of these claims were confirmed, some rejected and others referred specially to Congress for confirmation or rejection. The Commissioners after discussing at length the n erits of some of these claims and others made a list of those rejected, those specially referred to Congress and those confirmed. Lot 369 does not appear in the two first mentioned schedules or abstracts, but in the list or abstracts of those claims confirmed appears one which was claimed by Barrios under mesne conveyance dated Feby. 18, 1814. On that date Montero who purchased from the Cabildo lot 369 conveyed it to Barrios. The abstract gives the number of the lot as 399, a number greater than that borne by any lot referred to by the Commisisoners anywhere else in their report so far as we have discovered. In fact number 369 is the highest number borne by any lot referred to by the Commissioners aside from the one instance above mentioned. This entry in the abstract follows an entry dealing with lot 368 in the same order in which the two entries dealing with lots 368 and 369 appear in the list of lots sold at public auction by order of the Superiority of the town and hereinbefore mentioned.

In view of these facts we think the entry in Schedule "F" No. 47 deals with lot 369 and that the second figure of the number 399 appearing in that entry as the lot number is a typographical error and the lot number appearing in that entry should be 369 instead of 399.

It thus appears that the title to lot 369 passed out of the government of Spain to Antonio Montero, and by him conveyed to Barrios and the claim of M. Hanna and Widow McPherson to the lot which appears to have been based on a sale at auction was confirmed by the United States Government.

It is unnecessary to discuss the assignment of error based upon the court's ruling sustaining defendant's objection to the reading in evidence of the certified copy of the judgment of Bobe v. Hanna and his wife, because as there appeared a break in the chain of plaintiff's title from Barrios to M. Hanna and the Widow McPherson the deed from the United States Marshal to Bobe purporting to convey the lot involved in this litigation was offered and received in evidence as color of title and there was evidence enough to go to the jury upon the question of plaintiff's title to the lot based upon possession by him and his grantors for more than twenty years. Upon the question of the boundaries of the lot we said in the opinion granting a rehearing in this case that "there is room for difference of opinion between reasonable men as to whether the boundaries of Lot. No. 369 extended to high water mark of the bay." A re-examination of the evidence in this case confirms us in this view. In that case the question should not have been taken from the jury by a peremptory charge. See Anderson v. Southern Cotton Oil Co., 73 Fla. 432, 74 South. Rep. 975, L. R. A. (N. S.) 1917 E. 715.

The defendants pleaded that the submerged land, lying south of the lot, between ordinary high water mark and a point where the waters of the Bay in the direction of the channel reached the pier head line was granted by the Legislature of Florida to the City of Pensacola and that the city granted the same to the defendant railway

company for purposes of railroad terminals, docks, piers, wharves and other instrumentalities of commerce and navigation with authority to improve same for such purposes, and that the defendant construction company acting under authority and for the benefit of the railroad company filled in the submerged land and builded thereon the docks, wharves and other instrumentalities of commerce, which are the alleged acts complained of in the declaration. The plaintiff demurred to the plea and the demurrer was overruled. If the plea was good it was a complete defense; if it was bad the demurrer should have been sustained.

The plea rests upon Chapter 4802 Laws of Florida, 1899. The second section of the act purports to grant to the City of Pensacola, except as otherwise provided in the act, the space west of Alcaniz Street and east of Barcelona Street and south of Hickory Street and the spaces included in a map of the water front of the city adopted by the Provisional Municipality to the east of Alcaniz street and to the west of Barcelona street covered by water "exceeding at this time twelve feet in depth, such spaces to be held by the city in perpetual trust for the public and to remain forever open to navigation and free access to the streets and wharves on the streets running north and south and to such other streets as the city may by ordinance lay out in any direction over any part of the space covered by this act from the intersection of any now existing street with the shore line to the southern limit of such space." Section one of the act provides that it is the object of the act to dispose of all the land in front of the City of Pensacola embraced within the limits of the map of said waterfront above mentioned "and the grants herein made are of the streets and lots as laid down on said map." Section 3

grants to the "city the title to the soil and any water thereon embraced in the streets as delineated upon said map other than in the space granted in trust in section 2." Section 4 grants in fee simple the improved lots in the space mentioned in section 1 to such persons as prior to January 1, 1898, have by themselves or those under whom they hold improved the same. Section 5 provides for the appointment of commissioners for the purpose of "ascertaining and declaring the rights of those to whom rights are granted by this act." It pro vides for the compensation to be paid the Commissioners, the appointment of their successors, the keeping of a record of all claims considered by them, and that two-thirds of the Commission shall decide all questions. Section 6 vests in the Commission power to "summon witnesses, to swear them, hear testimony and receive evidence and finally determine the rights of persons (including the City of Pensacola) to whom grants are herein made and such determination shall be conclusive as to such right." This section also provides that "upon such determination they (the Commissioners) shall jointly execute a deed for the lots or portions of lots to all persons whom they shall find to be entitled under the provisions of this act and such deed shall convey in fee simple all the rights of the State to the lot or lots therein mentioned, and shall authorize the exclusive appropriation of such property to private uses by the grantee or his assigns: Provided, that whenever any property granted under this act is in litigation between parties, then any deed made hereunder shall be without prejudice to the rights under this act of the party who may be adjudicated to be entitled to possession." Section 7 provides that in making such adjudication and deed the Commissioners shall not regard any claims of

riparian rights or other rights not covered by this act and shall make deeds as if no such rights could arise but such determination and deeds shall in no wise be regarded as affecting any such actually existing rights." The act further provides that the Commisisoners shall not determine the effect of the act upon any lot except upon the application of some person claiming the same under the provisions of the act; prescribes the proceedings in such cases; a limitation of two years in which to file claims; that at the expiration of that time from the passage of the act the Commisisoners shall determine all unadjudicated applications, give to the person entitled thereto deeds, and after satisfying the requirements of Section 3 of the act the Commissioners shall make a deed to the City of Pensacola for "all lots and portions of lots for which no application shall have been filed (except certain key lots covered by water between Palafox Street wharf and Baylen street wharf, etc.) and for all lots and portions of lots adjudicated to applicants, but for which they shall have received no deed because of their refusal or neglect to pay the Commissioners' fees; for the employment of a clerk and his compensation, and a surveyor; and the keeping of a record showing each deed made; a deposit by each claimant of one dollar for each lot claimed by him, and for the deposit in the office of the Clerk of the Circuit Court of Escambia County of the records made by the Commissioners.

This act undertakes to deprive without compensation the owner of lots, the boundaries of which extend to high water mark of the Bay, lying within the area covered by the map of the water front referred to in the act, of their rights under the common law as riparian owners. We have said that the rights of a riparian owner at

common law-constituted property of which he could not be deprived without just compensation. See Broward v. Mabry, *supra.* This view we think is sustained by the weight of authority.

Mr. Farnham in his work on the "Law of Waters and Water Rights" in Volume 1, page 297 says: "It thus appearing from the preceding sections that at common law the riparian owner has a right of access to the stream which cannot be destroyed even for the improvement of navigation without making compensation to the owner, the right should be much more fully protected in this country where the constitutions prevent the taking of private property for public use withiut making compensation. And the general rule is that the rights are protected." He observes however that a few of the courts have refused to recognize a right of property in the riparian owner, or have held that it was subordinate to the public right, so that they have permitted the right to be cut off without any redress or compensation. See Yates v .Milwaukee, *supra;* Van Dolsen v. Mayor of New York, 21 Blatchf. (U. S.) 453; Myers v. City of St. Louis, 82 Mo. 367; Clark v. Cambridge & A. Irr. & Imp. Co.; 45 Neb. 798, 64 N. W. Rep. 239; Clark v. Peckham, 10 R. I. 35.

Mr. Justice MILLER in Yates v. Milwaukee, speaking for the Supreme Court of the United States said: "This riparian right is property and is valuable, and, though it must be enjoyed in due subjection to the rights of the public, it cannot be arbitrarily or capriciously destroyed or impaired. It is a right of which when once vested, the owner can only be deprived in accordance with established law, and if necessary that it be taken for the public good, upon due compensation." See also Potomac Steam-boat Co. v. Upper Potomac Steam-boat

Co., 109 U. S. 672; 3 Sup. Ct. Rep. 445; 4 Sup. Ct. Rep. 15; Bell v. Gough, 23 N. J. L. 624; Trenton Water Power Co. v. Raff, 36 N. J. L. 335; Gould on Waters, Sec. 246.

Riparian rights we think are property, and being so the right to take it for public use without compensation does not exist. The fronting of a lot upon a navigable stream or bay often constitutes its chief value and desirability whether for residence or business purpose. The right of access to the property over the water, the unobstructed view of the bay and the enjoyment of the privileges of the waters incident to ownership of the bordering land would not in many cases be exchanged for the price of an inland lot in the same vicinity. In many cases doubtless the riparian rights incident to the ownership of the land were the principal if not sole inducement leading to its purchase by one and the reason for the price charged by the seller.

The owner of land bounded by tide water may maintain an action against a railroad corporation constructing its road by authority of the legislature so as to cut off his access to the water is held in Williams v. Mayor of New York, 105 N. Y. 419, 11 N. E. Rep. 829; Rumsey v. New York, N. E. R. Co., 133 N. Y. 79, 30 N. E. Rep. 654.

We do not appreciate the force of the argument that the State as owner of the submerged land between high and low water mark should not in the event it desires to improve the water front for navigation be required to pay to the owner of the upland a just compensation for injury to his property incident to such public enterprise. But this is not such a case. A railroad company operated by private capital, controlled by private individuals, conducts its business for private gain is seeking to utilize the water front for its own use but claims immunity

from liability for damages to the plaintiff upon the ground that the work of filling up the submerged lands, and building piers out into the bay incidentally benefits commerce and navigation, although it also destroys a large part of the value of plaintiff's property perhaps by wholly depriving him of his rights as a riparian owner.

The plea of justification under this statute we think was not good, and the demurrer should therefore have been sustained.

The judgment of the court below is reversed.

BROWNE, C. J., AND TAYLOR, WHITFIELD AND WEST, J. J., concur.